[Civ. No. 11805.   Third Dist.   June 16, 1969.]

EDWIN P. JOHNSTON, Plaintiff and Respondent, v.
COUNTY OF YOLO, Defendant and Appellant.

Rust, Hoffman, & Mills, David C. Rust, Ellis J. Horvitz, Rodegerdts, Means & Northup, and Charles R. Mack, County Counsel, for Defendant and Appellant.

J. Adrian Palmquist, William R. Manson and James H. Burke for Plaintiff and Respondent.

FRIEDMAN, J.—The County of Yolo appeals after a jury awarded personal injury damages against it. Plaintiff, Edwin Johnston, age 22, had been a passenger in an automobile driven by Clifford Jutkins. Johnston was injured in the early morning hours of April 4, 1964, when Jutkins failed to negotiate a double curve in County Road 87 and his car toppled into a ditch.

At the trial plaintiff elicited evidence tending to show that the double curve as constructed—not later defects in maintenance or operation—formed a dangerous condition of the county road. Government Code sections 830 and 835 fix the general standards governing a public entity's liability for the dangerous condition of its property.[1] Section 830.6 establishes an immunity from liability where the injury is caused by a

---

[1]Government Code section 830, subdivision (a), defines a dangerous condition of property as one that creates "a substantial . . . risk of injury when such property or adjacent property is used with due care in a manner in which it is reasonably foreseeable that it will be used." The statutory definition is the approximate equivalent of the judicially approved definition: " 'Public property is in a dangerous or defective condition when it involves an unreasonable risk of injury to the public.' " (*Pfeifer* v. *County of San Joaquin*, 67 Cal.2d 177, 182 [60 Cal.Rptr. 493, 430 P.2d 51].)

Government Code, section 835, provides: "Except as provided by statute, a public entity is liable for injury caused by a dangerous condition of its property if the plaintiff establishes that the property was in a dangerous condition at the time of the injury, that the injury was proximately caused by the dangerous condition, that the dangerous condition created a reasonably foreseeable risk of the kind of injury which was incurred, and that either:

" (a) A negligent or wrongful act or omission of an employee of the

reasonably conceived plan or design.[2] The county ·charges error in trial court rulings which prevented it from asserting the design immunity.

County Road 87 is a two-lane paved road stretching five or six miles northward from the town of Esparto. Approximately a mile north of Esparto there is a right-hand jog in the road. Originally this jog had been accomplished by two right-angle turns. In 1951 or 1952 the county reconstructed the jog, replacing the two sharp turns with a double curve in the general shape of a reverse S. About 550 feet north of the reverse S is an old, narrow, 400-foot bridge over Cache Creek.

On the night of the accident plaintiff and Jutkins were riding in the latter's car with two girl friends. During the evening they drove northward on County Road 87, traversing the double curve. Several hours later as they returned southward, they crossed the Cache Creek bridge but failed to negotiate the double curve. There was evidence of beer consumption, but no evidence that it affected Jutkins' driving ability. The passengers gave estimates of speed on the return journey varying from ''45 to 60'' miles per hour to ''about 70'' miles per hour. They described requests to Jutkins to drive more slowly. Plaintiff said that Jutkins slowed to 55 miles per hour as he entered the curve. Jutkins testified that he slowed to slightly under 40 miles per hour, but started his turn too late; that the curve was sharper than he thought; that there was some gravel in the road; that he went into a broadside skid; that the car went off the road to his left and rolled down an embankment. Other evidence denied presence of the gravel and several experts testified it could not have caused the skid.

North of the Cache Creek bridge was a sign bearing the

---

public entity within the scope of his employment created the dangerous condition; or

''(b) The public entity had actual or constructive notice of the dangerous condition under Section 835.2 a sufficient time prior to the injury to have taken measures to protect against the dangerous condition.''

[2]Government Code section 830.6: ''Neither a public entity nor a public employee is liable under this chapter for an injury caused by the plan or design of 'a construction of, or an improvement to, public property where such plan or design has been approved in advance of the construction or improvement by the legislative body of the public entity or by some other body or employee exercising discretionary authority to give such approval or where such plan or design is prepared in conformity with standards previously so approved, if the trial or appellate court determines that there is any substantial evidence upon the basis of which (a) a reasonable public employee could have adopted the plan or design or the standards therefor or (b) ·a reasonable legislative body or other body or employee could have approved the plan or design or the standards therefor.''

legend "Narrow Bridge." Approximately 150 feet south of the bridge and 400 feet north of the double curve was a sign bearing a curving arrow.[3] A broken white line was painted down the middle of the road. Jutkins testified that he had seen both the curved arrow and the white line as he proceeded toward the curve. The weather was clear, the road dry.

As the basis for its assertion of the design immunity described in section 830.6, the county relies upon the testimony of A. E. Rhoades, its former road commissioner. Plaintiff, not the county, had produced Rhoades as a witness. Rhoades testified that he was a licensed civil engineer and had been road commissioner for the county from 1948 to 1962. Sometimes in 1951 or 1952 Jim Naismith, a county supervisor, told Rhoades that Mr. Stevens, who owned land traversed by County Road 87, would donate enough land to permit the county to eliminate the two right-angle turns at the jog and to substitute curves. Rhoades had a survey crew go to the site and a pair of curves, each with a 450-foot radius, was staked out on the ground. Supervisor Naismith then told Rhoades that Stevens objected to the proposed design because he did not wish to donate the amount of land needed. Naismith instructed Rhoades to reduce the area required by the project. In order to achieve this result Rhoades sharpened the two curves, reducing each to a radius of 300 feet.

Up to the time of trial the county had not pleaded design immunity as a defense, although both the complaint and the pretrial order had included negligent design as an issue.[4] The immunity provided by section 830.6 must be pleaded and proved. (*Hilts* v. *County of Solano*, 265 Cal.App.2d 161, 175 [71 Cal.Rptr. 275]; see *Teall* v. *City of Cudahy*, 60 Cal.2d 431, 435 [34 Cal.Rptr. 869, 386 P.2d 493].) Following Rhoades' testimony the county moved the court to permit an amendment to its answer "to conform to proof," raising the

---

[3]This sign consisted of a curving black arrow on a yellow background, indicating a slight jog to the right. According to the nomenclature of the engineering witnesses, this kind of sign was designated W1R. Another sign, designated W2R, would have indicated a jog of two right-angles.

[4]Both in the superior court and at oral argument in this court, the county explained that it had been unable to locate any engineering plans or documents in the county files to show an "approved" design for the road alteration project; thus, that it did not recognize availability of the design immunity until plaintiff elicited Rhoades' testimony. Indeed, a county official testified to a fruitless search of the county files for information as to the date of the alteration project and for design documents. Rhoades himself testified that he had prepared drawings. Not until 1964, 12 or 13 years after the alteration project and after the occurrence of the accident in suit, did the county secure a grant from Stevens supplying an easement in land underlying the project.

immunity defense. The trial court took the motion under submission and did not thereafter act on it. After plaintiff rested, the county moved for a nonsuit on the asserted strength of the section 830.6 immunity. The motion was denied. Later the court rejected a requested jury instruction in the language of section 830.6.

## The Design Immunity.

In reviewing the trial court's exclusion of the design immunity defense, this court is concerned with the propriety of its action, not the reasons for it. (3 Witkin, Cal. Procedure (1954) Appeal, § 76.) The trial court relied upon the proposition that the design immunity statute had no force where use of the public works facility subsequent to construction revealed uncorrected danger in the original design. At the time of trial that proposition had support in an intermediate appellate decision (*Cabell* v. *State of California* (Cal.App.) 55 Cal.Rptr. 594) but was later rejected in *Cabell* v. *State of California,* 67 Cal.2d 150, 154 [60 Cal.Rptr. 476, 430 P.2d 34]. Nevertheless, exclusion of the immunity defense was proper ·because the county had failed to prove it in a vital particular.

Notwithstanding prevailing liberality in the amendment of pleadings to conform to proof, an amendment will not be permitted where there is a complete failure of proof, that is, where "the allegation of the claim or defense to which the proof is directed, is unproved, not in some particular or particulars only, but in its general scope and meaning . . . ." (Code Civ. Proc., § 471; 2 Witkin, Cal. Procedure (1954) Pleading, § 603; 2 Chadbourn, Grossman & Van Alstyne, Cal. Pleading, § 1097.) Although the decisions usually involve amendment of complaints, section 471 speaks of defenses as well as claims, hence applies with equal vigor to the amendment of answers. (*Brown* v. *Sweet,* 95 Cal.App. 117, 124-125 [272 P. 614].) The trial court's refusal to permit the county's pleading amendment must be sustained because a fact vital to the proposed defense was unproved "in its general scope and meaning."

In order to gain advantage of the design immunity provided by Government Code section 830.6, Yolo County had to show the design's approval in advance of construction by the official or board exercising discretionary authority to give that approval. The defense held out by section 830.6 rests upon a combination of three statutory elements: first, a causal relationship between the plan or design and the accident; second,

the design's approval in advance of construction by a legislative body or officer exercising discretionary authority; third, a court finding of substantial evidence of the design's reasonableness. The second statutory element, approval, must occur first in chronological order. It is a vital precondition of the design immunity.

Approval, according to section 830.6, is expressed as an action "by the legislative body of the public entity or by some other body or employee exercising discretionary authority to give such approval. . . ." As we interpret the statute, the possession of discretionary authority must characterize the approving agency, whether it be the legislative body or an administrative official. In the affairs of a public entity (e.g., a county, city or public district) the locus of discretionary authority is fixed by law. A governing council such as a board of supervisors has no "inherent" power to exercise an authority delegated by law to an administrative officer. (*Johnston* v. *Board of Supervisors*, 31 Cal.2d 66, 73-74 [187 P.2d 686]; *Coulter* v. *Pool*, 187 Cal. 181, 186-187, 189 [201 P. 120].) Conversely, a statutory delegation of power to a specified administrative officer bars the legislative body from exercising it. (*O'Melveney* v. *Griffith*, 178 Cal. 1, 5 [171 P. 934]; 62 C.J.S., Municipal Corporations, § 554.) One looks to the law fixing the public entity's internal distribution of powers to discern whether the legislative body or, alternatively, some administrative board or officer, exercise discretionary approval authority for the purpose of section 830.6.

This interpretation of section 830.6 is consistent with its rationale: " 'There should be immunity from liability for the plan or design of public construction and improvements where the plan or design has been approved by a governmental agency exercising discretionary authority, unless there is no reasonable basis for such approval.' " (*Cabell* v. *State of California, supra,* 67 Cal.2d at p. 153, quoting from Recommendation Relating to Sovereign Immunity, Cal. Law Revision Com. 823.)

Although earlier California statutes had vested county supervisors with direct administrative powers over the county road system (see *Coulter* v. *Pool, supra,* 187 Cal. 181), the Collier-Burns Highway Act of 1947 placed the board of supervisors in a policy-making and budgetary role, reposing direct administrative responsibility in a county road commissioner. With certain exceptions, the road commissioner had to be a registered civil enginer. He could be discharged only by

a majority vote of the supervisors. (Sts. & Hy. Code, §§ 2206, 2009, as added by Stats. 1947, First Ex. Sess., ch. 11.) The general purpose of the 1947 legislation was to confide immediate responsibility for highway planning, design and administration in a competent engineer, usually a registered one, who was equipped by training and professional status to make engineering decisions affecting highway safety and efficiency. (See Sts. & Hy. Code, §§ 1076, 1191, 1331; *Hard* v. *County of Plumas,* 35 Cal.2d 577, 580 [220 P.2d 2].) The Civil and Professional Engineers Act declares that the assumption of responsibility for highway design and planning is part of the practice of civil engineering. (Bus. & Prof. Code, §§ 6731, 6734.) Registration of one who practices civil engineering in a public or private capacity is aimed at safeguarding "life, health, property and public welfare." (Bus. & Prof. Code, § 6730.) Engineering plans and documents prepared by a civil engineer must bear his signature, registration number and seal; these indicate his professional responsibility for them. (Bus. & Prof. Code, § 6735.)

By force of the Streets and Highways Code provisions, Yolo County's road commissioner, not its board of supervisors and not an individual supervisor, was the public agent exercising discretionary authority to approve the design of the double-curve alteration project in 1951 or 1952. ▓ The term "approve" has no technical meaning and usually has the significance given it by ordinary usage. (*Estate of Majtan,* 237 Cal.App.2d 7, 22 [46 Cal.Rptr. 561].) A standard source gives this definition: "[T]o judge and find commendable or acceptable: think well of." (Webster's New Internat. Dict. (3d ed. 1965).) Employed in a statute, approval usually connotes the exercise of discretion and judgment. (*Cosner* v. *Board of Supervisors of Colusa County,* 58 Cal. 274, 277; *Brown* v. *Cranston,* 214 Cal.App.2d 660, 669-670 [29 Cal.Rptr. 725].) ▓ This connotation fits with precision into the language and rationale of section 830.6.

The subject of Rhoades' discretionary judgment, a proposed road design, fell within the range of his professional competence as a registered engineer. His status as a registered engineer was a qualification for his office. He occupied a dual status. His discretion was limited simultaneously by his duty as a public officer and his obligation as a professional engineer. In his latter role the project's safety was his prime concern. As an engineer he was a professional arbiter, exercis-

ing an impartial judgment in conformity with the standards of his profession. (*Macomber* v. *State of California*, 250 Cal. App.2d 391, 398 [58 Cal.Rptr. 393].) He could approve a plan or design in the sense intended by section 830.6 only when his action simultaneously expressed both official and professional approbation.[5]

In the present lawsuit nonconflicting evidence demonstrated that Rhoades, the county road commissioner, never approved the design of the double-curve alteration project. To the contrary, it demonstrates that he disapproved it but ordered it built anyway. He testified explicitly that he had changed the radii of the two curves from 450 to 300 feet because he had been "instructed" to do so in order to reduce the land area to be donated to the county. In substance, he signified that the changed design was contrary to his professional judgment as an engineer but he felt constrained to order its construction out of deference to the wishes of a member of the county board of supervisors.[6]

Yolo County sought leave to amend its pleading to inject design immunity as a defense. It had failed, however, to pro-

---

[5]Section 2006, Streets and Highways Code, states: "The road commissioner shall at all times be under the direction and supervision of the board of supervisors . . . ." Although this provision supplies toehold for a claim that the board of supervisors has discretionary authority to approve a highway design over the road commissioner's nonacquiescence, it stands in contrast with section 2009, which declares: "The board of supervisors shall act as the policy-making body with respect to county highway matters and shall by appropriate action establish the general policies to be followed by the road commissioner in the administration of his department. . . ." The latter provision weakens the claim that the board of supervisors may assume power over specific engineering determinations. The problem has no significance here, since there is no evidence that the Yolo County board of supervisors ever sought to "approve" the double curve design over Rhoades' head.

A statutory interpretation equating approval with professional approbation does not prevent the design compromises often demanded by limited funds. It simply means that a public engineer exposes his employer-client to potential tort liability when he washes his hands of an unsafe design.

[6]The following excerpts from his testimony demonstrate that Rhoades designed the second version of the double curve against his professional judgment as an engineer:

"Q What was the reason for any change, if any?

"A The property owner came to the Supervisor after he saw how the road was layed [*sic*] out in the field and said it was taking more of his land than he was willing to give at that particular time.

"Q Were you instructed to make changes?

"A I was instructed to pull the curve back, shorter, and not take as much of the land from the property owner that was donating.

"Q Did that meet with your approval?

"A An engineer hates to alter his standards.

duce evidence of a fact crucial to the defense. The immunity's exclusion from the lawsuit was not error.

### *Jury Instructions.*

At plaintiff's request the trial court instructed the jury on the liability concepts established by Government Code sections

---

"Q And that is what you did do?
"A Yes."

\* \* \* \* \* \* \*

"Q You didn't know how much property you were going to have, and you must have had some standard by which to work, is that correct?
"A The right of way economics were the large factor."

\* \* \* \* \* \* \*

"Q When you originally designed the first curve that you staked out and the property owner objected to, you didn't have any supervisor telling you how to do it, did you?
"A No.
"Q You did that strictly as a licensed civil engineer with over 18 years of experience in road construction and what you thought was proper and safe, isn't that right?
"A That's correct.
"Q The road you finally built, you did under political pressure, did you not?
"A Political pressure means many things and I don't understand?
"Q Maybe you don't like that political pressure. But you designed and constructed the second time, and it did not have the blessing of your years of experience and membership in the County Engineers Association and your license as a civil engineer, did it?
"A No.
"Q That was done simply because you were instructed to do it that way?
"A That's correct.

\* \* \* \* \* \* \*

"Q By answer to counsel, what you mean is, given so much, and no more, then you are told do it, and you did the only thing you could do, right?
"A That's correct.
"Q And that was done without regard to minimum standards, without regard to your experience, without regard to what you know was the proper thing to do?
"A That, also, is correct."
The county relies upon the following colloquy as evidence that Rhoades approved the design for the purpose of section 830.6:
"Q You have already testified that the second plan was one prepared under your direction and approved by you for construction, is that correct?
[ .¦'A That's correct."
The last excerpt illustrates only a shifting coloration given the word "approved." At this point it signified only that Rhoades ordered that construction proceed in conformity with the second design, not that he found it commendable or even acceptable in the exercise of his judgment as a professional engineer and county road commissioner. At no point did the county ask its former road commissioner a question designed to elicit whether he had approved the design as a reasonably safe design before its construction.

835 and 835.4.[7] The county charges that this combination of instructions impliedly submitted to the jury the question of the county's liability for *creating* the remodeled road jog as a dangerous condition, a question forestalled by section 830.6, the design immunity. A companion complaint is that the court refused an instruction expressly submitting the design immunity issue to the jury.

These contentions assume that the evidence entitled the county to the design immunity. As we have concluded, it did not. Usually there is no occasion to embody the design immunity in a jury instruction, for the issue becomes one for the judge, who may resolve it by granting or denying a summary judgment or nonsuit. If the judge upholds the immunity, the project's intrinsic danger, revealed either by the original design or by later mishaps, is never submitted to the jury. Alternatively, if non-conflicting evidence establishes the public defendant's lack of eligibility for the immunity, the project's intrinsic danger (revealed by the original design or by later mishaps) becomes a jury issue. The former alternative characterized both *Cabell* v. *State of California* and *Becker* v. *Johnston,* 67 Cal.2d 163 [60 Cal.Rptr. 485, 430 P.2d 43]. The latter alternative characterizes the present case. (Cf. *Hilts* v. *County of Solano, supra,* 265 Cal.App.2d at p. 175.) The jury instructions fitted the latter alternative.

The plaintiff's evidence included expert testimony designed to show that the road jog constituted a hidden danger which should have been revealed by warning signs and reflectorized "paddle" markers. Sections 830.4 and 830.8 establish immunity for a condition consisting solely of a failure to post regulatory or warning traffic signs and signals. The second

---

[7]Section 835 appears in footnote 1, *supra.* Section 835.4 provides: "(a) A public entity is not liable under subdivision (a) of Section 835 for injury caused by a condition of its property if the public entity establishes that the act or omission that created the condition was reasonable. The reasonableness of the act or omission that created the condition shall be determined by weighing the probability and gravity of potential injury to persons and property foreseeably exposed to the risk of injury against the practicability and cost of taking alternative action that would not create the risk of injury or of protecting against the risk of injury.

"(b) A public entity is not liable under subdivision (b) of Section 835 for injury caused by a dangerous condition of its property if the public entity establishes that the action it took to protect against the risk of injury created by the condition or its failure to take such action was reasonable. The reasonableness of the action or inaction of the public entity shall be determined by taking into consideration the time and opportunity it had to take action and by weighing the probability and gravity of potential injury to persons and property foreseeably exposed to the risk of injury against the practicability and cost of protecting against the risk of such injury."

sentence of section 830.8 qualifies this immunity where there has been a failure to post warning of a hidden danger.[8] The county charges error in the jury instructions covering this phase of the case.

■ The court did not err in refusing to give an instruction in the following form: "A public street or highway is not in a dangerous condition as that term has been defined solely because of the fact that the public entity did not provide a speed restriction sign. Physical conditions such as width, curvature, grade and surface conditions, or any other condition readily apparent to a driver, in the absence of other factors, do not require special downward speed zoning, because the basic speed law under the instruction which I have already given is sufficient regulation as to such conditions." The county justifies the instruction as an expression of Vehicle Code section 22350, the basic speed law, and Vehicle Code section 22358.5.[9]

Government Code section 814 et seq. form a comprehensive system of substantive rules covering public tort liability for dangerous conditions of public property, including streets and highways. The system's rules of liability are qualified by its rules of immunity. (Gov. Code, § 815, subd. (b); Van Alstyne, California Government Tort Liability (Cont. Ed. Bar 1964) §§ 5.1-5.6, 5.28, 6.3.) Sections 830.4 and 830.8 comprehensively describe the relationship of traffic sign posting to these liability and immunity rules. (See *Gardner* v.

---

[8]Government Code section 830.4: "A condition is not a dangerous condition within the meaning of this chapter merely because of the failure to provide regulatory traffic control signals, stop signs, yield right-of-way signs, or speed restriction signs, as described by the Vehicle Code, or distinctive roadway markings as described in Section 21460 of the Vehicle Code."

Government Code section 830.8: "Neither a public entity nor a public employee is liable under this chapter for an injury caused by the failure to provide traffic or warning signals, signs, markings or devices described in the Vehicle Code. Nothing in this section exonerates a public entity or public employee from liability for injury proximately caused by such failure if a signal, sign, marking or device (other than one described in Section 830.4) was necessary to warn of a dangerous condition which endangered the safe movement of traffic and which would not be reasonably apparent to, and would not have been anticipated by, a person exercising due care."

[9]Vehicle Code section 22358.5: "It is the intent of the Legislature that physical conditions such as width, curvature, grade and surface conditions, or any other condition readily apparent to a driver, in the absence of other factors, would not require special downward speed zoning, as the basic rule of section 22350 is sufficient regulation as to such conditions."

*City of San Jose,* 248 Cal.App.2d 798, 803 [57 Cal.Rptr. 176].) Vehicle Code section 22358.5 has the apparent purpose of discouraging speed limit signs made needless by obvious road conditions. (Assembly Interim Com. Report No. 7, Transportation and Commerce (Jan. 1961) p. 29.) Neither of the Vehicle Code provisions is designed as a rule of tort liability for dangerous highway conditions. (See *Perry* v. *City of Santa Monica,* 130 Cal.App.2d 370, 374-375 [279 P.2d 92].) Both are extraneous to such determinations. Plaintiff had provided evidence of conditions which exposed the county to liability, that is, conditions which were dangerous for reasons *other* than failure to post a speed restriction sign. The instruction was misleading, because it told the jury that the county was entitled as a matter of law to rely upon motorists' compliance with the basic speed law as a sufficient safeguard against "such conditions."

The trial court erred, somewhat mildly, in modifying this requested instruction and giving it to the jury in the following form: "A public street or highway is not in a dangerous condition as that term has been defined solely because of the fact that the public entity did not provide a regulatory speed sign, as opposed to an advisory speed sign." The county correctly points out that the phrase "advisory speed sign" is foreign to sections 830.4 and 830.8. In relation to the liability and immunity conditions described in these statutes, the phrase was extra-statutory, indefinite and cryptic. The instruction tended to convey the notion that the county might be liable for failing to post an advisory, as contrasted to a regulatory, speed sign. Such a notion, unaccompanied by the restrictive liability conditions described in section 830.8, was potentially prejudicial.

For two reasons the error falls short of actual prejudice: First, the county invited the error. It had requested a companion instruction, designed to fit the liability conditions of section 830.8, and itself had used the phrase "advisory speed sign." In effect, the county had told the court that the phrase "advisory speed sign" was a satisfactory method of describing the warning signs mentioned in the second sentence of section 830.8. In modifying the two instructions, the trial court transferred the county's proposed phrase from one instruction to the other. Second, the companion instruction, as modified by the trial court, comprehensively and correctly informed the jury of the liability conditions described in section 830.8 when a "warning" sign is not posted. When the

two instructions are read together, no prejudicial error appears.

### Evidence Of Previous Accidents.

■ The county assigns error in the admission of evidence of earlier one-car accidents at the same jog. Its argument rests in part on the theory that knowledge of accidents caused by an original design is irrelevant, since the causal relation between the design and the accident in suit evokes the immunity statute. Although that theory is consistent with *Cabell v. State of California, supra,* it is inapropos because of the county's ineligibility for the design immunity.

The evidence was admitted under the rule endowing the trial court with discretion to admit evidence of prior accidents where the conditions are similar. (Witkin, Cal. Evidence (2d ed. 1966) § 351.) Pointing out that the prior accidents all involved automobiles approaching the double curve from the south (Jutkins approached it from the north), the county contends that the conditions were dissimilar. It points out that there was nothing to slow down northbound cars as they approached the jog, while southbound vehicles, according to some expert evidence, would tend to slow because of the narrow bridge preceding the jog. The double curve, however, had the same geometry whether approached from north or south. Differences in the approaches could be argued to reasonable jurors and understood by them. Admission of the evidence was not an abuse of discretion.

### Sufficiency Of The Evidence.

■ The county contends there is "no factual basis" for imposing liability except that inhering in the original design and construction. This contention assumes the county's eligibility for the design immunity, an assumption we have rejected. In fairness to the county, we shall view this contention as a charge of lack of substantial evidence of a dangerous condition.

There was conflicting expert evidence regarding the remodeled road jog. Experts called by plaintiff testified that under the conditions an appropriate minimum radius for each curve should have been 600 feet; that the condition called for a warning sign indicating two sharp turns rather than the sign bearing the curving arrow; that the condition called additionally for "paddle" reflectors plus a sign warning motorists to reduce speed to 30 miles per hour. One of these experts

testified that the condition constituted a "maintenance hazard" and "a risk for the prudent motorist."

A defense expert testified that the warning signs were adequate; that the narrow bridge slowed down southbound traffic and obviated the need for a speed reduction warning. He stated: "Well, if we use now the current standards, you can see this 300 foot radius isn't an unreasonable design and I would say for a temporary construction, it was a good design. It fitted the ground, met all the conditions, and the fact that the traffic is very light, I personally—it is my opinion this is a good design."

Most of the opinion testimony fixed the maximum safe speed on the double curve at 30 miles per hour. One opinion suggested 45 miles per hour with "dry weather with good tires."

Four witnesses described 10 earlier accidents in which northbound cars had failed to negotiate the double curve. There was no evidence of prior accidents involving southbound vehicles. Additionally, the jury heard the testimony of Mr. Rhoades, summarized and quoted *supra*.

In satisfaction of Government Code section 830, subdivision (a) (see fn. 1, *supra*), a reasonable jury could find from this evidence that Yolo County had built a double curve which its own engineer believed to be unsafe and had failed to post adequate warnings notwithstanding a series of accidents; that the combination of sharp curves and inadequate warning created a dangerous condition, that is, a substantial (as distinguished from insignificant) risk of injury when used in a reasonably foreseeable manner. Indeed, the county's expert witness testified that the design was a "good" one for "a temporary construction." Since the double curve had been in existence for about 12 years preceding the accident, the jurors could reasonably draw an unfavorable inference from this testimony.

In satisfaction of Government Code section 835 (fn. 1, *supra*) the jury could reasonably find that this dangerous condition (adequate to handle a vehicle at 30 miles per hour) proximately caused the overturn of the Jutkins vehicle, which was traveling at 40 to 55 miles per hour; that this particular kind of accident was reasonably foreseeable; that the danger was either created by the county's negligence or the county had knowledge of it in time to safeguard against it. In satisfaction of section 835.4 (fn. 6, *supra*), the jury could find that the condition was unreasonable or that the county did

not take reasonable steps to guard against it. In satisfaction of the second sentence of section 830.8 (fn. 7, *supra*), it could find that a proximate contributing cause of the accident was the county's failure to post warnings of a danger not reasonably apparent to a prudent driver at night. The fact that Jutkins had driven northward over the same jog a few hours earlier might militate against but would not prevent this finding.

Judgment affirmed.

Pierce, P. J., and Janes, J., concurred.

A petition for a rehearing was denied July 11, 1969, and appellant's petition for a hearing by the Supreme Court was denied August 13, 1969.