[Sac. No. 7799.   In Bank.   July 28, 1967.]

FRANK BECKER, Plaintiff, Cross-defendant and Respondent, v. MARGARET JEAN JOHNSTON, Defendant, Cross-complainant and Appellant; COUNTY OF SACRAMENTO, Cross-defendant and Respondent.

---

*Retired Associate Justice of the Supreme Court sitting under assignment by the Chairman of the Judicial Council.

†Assigned by the Chairman of the Judicial Council.

Rust & Hoffman, David C. Rust and Ellis J. Horvitz for Defendant, Cross-complainant and Appellant.

McGregor, Bullen & Erich and Michael M. McKone for Plaintiff, Cross-defendant and Respondent.

McLaughlin, Russell, McCarthy & Kaelin and Jerome M. McLaughlin for Cross-defendant and Respondent.

Harry S. Fenton, Robert F. Carlson and Kenneth G. Nellis as Amici Curiae on behalf of Cross-defendant and Respondent.

BURKE, J.—This personal injury action arose out of a collision of automobiles at an intersection. Defendant and cross-complainant Mrs. Johnston appeals from a judgment of nonsuit in favor of cross-defendants Frank Becker and the County of Sacramento.[1] We have concluded that the county has successfully established the plan or design immunity found in Government Code section 830.6,[2] that the trial court correctly withheld from the jury the issue of Becker's liability, and that the judgment should be affirmed as to both cross-defendants.

The nonsuit was properly granted only if, disregarding conflicting evidence and giving cross-complainant's evidence all the value to which it is legally entitled and indulging in every legitimate inference which may be drawn in her favor, the result is a determination that there is no

---

[1] The claim of plaintiffs, Mr. and Mrs. Becker, against defendant was settled before trial.

[2] All section references are to the Government Code unless otherwise stated.

evidence of sufficient substantiality to support a verdict in her favor. (*Reuther* v. *Viall* (1965) 62 Cal.2d 470, 474-475 [3] [42 Cal.Rptr. 456, 398 P.2d 792], and cases there cited.)

The collision here involved occurred on a night in March 1963 in the County of Sacramento on Auburn Boulevard, a two-lane highway, near a Y intersection which Auburn forms with Sylvan Road. Appended is a diagram of the intersection (a reduced photostat of cross-complainant's Exh. 2). The car driven by Mrs. Johnston, southbound on Auburn, crossed into the northbound lane at the Y intersection at Sylvan and collided with the Becker car, which was traveling north on Auburn.

As against the county, Mrs. Johnston contends that the intersection was in a dangerous condition which proximately contributed to her injuries. The 1963 Tort Claims Act set forth in the Government Code applies. (*Cabell* v. *State of California, ante,* p. 150 [60 Cal.Rptr. 476, 430 P.2d 34].) Section 835 specifies the prerequisites to liability of a public entity for injury caused by a dangerous condition of its property. The county urges that Mrs. Johnston has made no showing meeting such prerequisites. The county also relies upon the plan or design immunity provided by section 830.6. (See fn. 2 of *Cabell* v. *State of California, supra.*)

Auburn Boulevard is a through highway which runs generally north to south. However, as Auburn proceeds to the south it curves to the right (southwesterly) as it approaches Sylvan Road, which cuts into Auburn in a south to north path. Sylvan Road traffic is controlled by a stop sign at this intersection. Auburn comprises the stem and right arm of the Y. At the stem Auburn runs in a north-south direction, with the base of the stem being north of the intersection. At the intersection, the gradual curve of Auburn to the right in a southwesterly direction creates the right arm of the Y. The left arm is Sylvan. The speed limit was 40 miles per hour. There was no stop sign regulating northbound traffic on Auburn as it entered the intersection, nor was there a stop sign regulating southbound traffic on Auburn as it entered and proceeded through the intersection, regardless of whether such traffic curved to the right and remained on Auburn or continued in a straight line across the northbound lane of Auburn into Sylvan. The only stop sign at the intersection was that regulating northbound traffic on Sylvan.

On Auburn there were two standard highway signs facing southbound traffic. The first sign, about 750 feet north of the

intersection, was yellow with a black arrow curving to the right, thus indicating that Auburn curved to the right. The other, approximately 350 feet north of the intersection, was a Y sign indicating the intersection. Auburn had a "noticeable" super-elevation or bank in its curve to the right; i.e., Auburn was banked so that its east side would be higher than its west side. A double yellow line marked the center of Auburn except for a distance of 90 feet where Auburn intersects with Sylvan.

The night was dark, the weather was clear, and visibility was good. There was no stationary illumination at the intersection. However, a traffic officer who investigated the accident testified that "at the beginning of the curve" a southbound driver had unobstructed visibility of Auburn to a point at least halfway around the curve, a distance of 400 to 450 feet.

At about midnight cross-complainant Mrs. Johnston was driving south on Auburn at 35 to 40 miles per hour in the direction of the Y intersection. She testified that she was not familiar with this area, had never been there before, and was not aware that Auburn curved to the right and that if she continued to drive straight ahead she would enter Sylvan Road. Her intention was to continue southbound on Auburn rather than to go on to Sylvan. She did not recall noticing any specific signs prior to entering the intersection, and she did not know that the place at which the accident occurred was in fact an intersection. It is thus apparent that she failed to observe or take notice of either the curve sign 750 north of the interesection or the Y sign some 350 feet therefrom.

Immediately before the accident Mrs. Johnston first saw a set of directly oncoming headlights on the other side of the road. At about the same time she saw the headlights on what proved to be Mr. Becker's car approaching her from what appeared to be a right angle. She kept his car in view at all times, but thought that it was approaching from a side road and would stop. It did not. She further testified that she did not see her car cross a double line at the intersection prior to the collision and that if she had driven her car across a double line, she would have seen it. However, as noted above, there was a double line marking the center of Auburn, except for a short distance (90 feet) where it intersected with Sylvan. (See the attached diagram.)

Cross-defendant Becker was driving north on Auburn around the curve at a speed of 35 to 40 miles per hour. He

was familiar with the road and with the Y intersection. He testified that as he approached the intersection he saw Mrs. Johnston's headlights but no turning blinkers were turned on; and he assumed that she would continue around the curve on Auburn rather than proceed straight into Sylvan Road. He was unable to tell that her vehicle was crossing the north-bound lane of Auburn until he was about 100 feet from the point of impact, at which time he was unable to avoid the collision. He further testified that he first saw Mrs. Johnston's car come across into the northbound lane in the area of the intersection where the double line is interrupted; he was then at the point marked as B 3 in the attached diagram. When asked if he applied his brakes at this point, he replied: "Well, not there. Just as I got up a little farther I saw she was coming right across in front of me, then I applied the brakes."

The Y intersection was constructed by the State of California in 1929. Until 1957, when the Sacramento-Roseville Freeway was opened, Auburn Boulevard, including the curve and intersection, was maintained by the state as Highways 40 and 99E, which was the main highway between Sacramento and Roseville and carried through traffic which was thereafter diverted to the freeway. The highway remained in essentially the same physical condition during that period of time. After the freeway was opened the state relinquished control of the highway to the county.

The county's traffic engineer, called by Mrs. Johnston as a witness under section 2055 Code of Civil Procedure, testified that in a hypothetical case a Y intersection with the hazard of head-on collisions is a classic example of bad engineering practice, and generally speaking is a dangerous condition in the absence of warnings. However, with respect to a particular intersection it depends on the physical condition and the traffic volume. In the intersection of Auburn Boulevard and Sylvan Road the "area for head-on collisions existed" and the intersection was "channeling" such collisions in "the broad sense of the term 'channeling,'" but in determining whether to maintain it in the same condition "the traffic volume is something that we have to take into consideration." A traffic count[3] taken in 1961 showed an average of

---

[3] One of the purposes of a traffic count "is to establish the more important roads that have to be worked on, to establish the general routine of traffic throughout the County, to compute accident rates, this type of thing." In March 1963, when this accident occurred, there were some

11,800 vehicles a day (i.e., some four million per year) traveling on Auburn just north of Sylvan, but during the four-year period of 1959 through 1962 there were only eight accidents at the intersection, of which only three were head-on collisions. From a study of this history the witness did not conclude the intersection was dangerous or warranted change; in his opinion "Under the conditions and past history it was operating satisfactorily [and] in a good engineering manner" in 1963 (when the collision here involved took place). The witness agreed that some motorists could become confused when entering the intersection, especially at night; however, warning signs are held to a minimum as the use of "more than several" tends to confuse the motorist. Further, some motorists go through stop signs and some through red lights.[4]

A consulting traffic engineer who was familiar with the intersection testified that "this type of design, particularly because of the nature of the conflicting movements that result from a two-way Y . . . is not considered to be good engineering," and that "in my opinion, to maintain an intersection with this design over" the period of 1957 to 1963 "would not be good engineering. . . . [G]ood engineering design attempts to either eliminate conflicts completely, and these would be on freeways, which we are not talking about, . . . but the minimizing the conflict at the great intersections by—in effect, number one: minimizing or eliminating head-on collisions." The witness expressed the further opinion that "If you had eleven thousand cars a day going through that intersection you, as a traffic engineer . . . if you took no action . . . would be allowing . . . a hazardous intersection to continue to operate"; that hazards increase at night "and particularly this type because it is most difficult to judge distances, speed and everything else when you are approaching a vehicle as distinguished from coming in at right angles"; that the danger of head-on collisions could be reduced by 70 percent to 90 percent by constructing a traffic island at an estimated cost of less than $5,000.

---

1,900 miles of county road under the supervision of the county traffic engineer's office.

[4]Following the accident here involved, and in connection with an improvement program requested by property owners in an assessment district proceeding, the intersection was changed and the head-on collision area eliminated. However, section 830.5, subdivision (b), provides that "The fact that action was taken after an injury occurred to protect against a condition of public property *is not evidence* that the public property was in a dangerous condition at the time of the injury." (Italics added.)

■ In our view the above-related evidence is sufficient to support a jury finding that Mrs. Johnston has shown the existence of a dangerous condition under section 835 and related sections.[5] Section 835 requires that she establish (1) dangerous condition of public property which (2) proximately contributed to her injury and which (3) created a reasonably foreseeable risk of such injury, and (4) that either (a) a negligent or wrongful act or omission of a public employee within the scope of his employment created the dangerous condition, or (b) the county had notice of the dangerous condition under section 835.2[6] a sufficient time prior to the injury to have taken protective measures. Although section 830, subdivision (a), defines "dangerous condition" as "a condition of property that creates a subtantial (as distinguished from a minor, trivial or insignificant) risk of injury when such propety or adjacent property is used with due care in a manner in which it is reasonably foresee-

---

[5]Section 835: "Except as provided by statute, a public entity is liable for injury caused by a dangerous condition of its property if the plaintiff establishes that the property was in a dangerous condition at the time of the injury, that the injury was proximately caused by the dangerous condition, that the dangerous condition created a reasonably foreseeable risk of the kind of injury which was incurred, and that either:

"(a) A negligent or wrongful act or omission of an employee of the public entity within the scope of his employment created the dangerous condition; or

"(b) The public entity had actual or constructive notice of the dangerous condition under Section 835.2 a sufficient time prior to the injury to have taken measures to protect against the dangerous condition."

[6]Section 835.2: "(a) A public entity had actual notice of a dangerous condition within the meaning of subdivision (b) of Section 835 if it had actual knowledge of the existence of the condition and knew or should have known of its dangerous character.

"(b) A public entity had constructive notice of a dangerous condition within the meaning of subdivision (b) of Section 835 only if the plaintiff establishes that the condition had existed for such a period of time and was of such an obvious nature that the public entity, in the exercise of due care, should have discovered the condition and its dangerous character. On the issue of due care, admissible evidence includes but is not limited to evidence as to:

"(1) Whether the existence of the condition and its dangerous character would have been discovered by an inspection system that was reasonably adequate (considering the practicability and cost of inspection weighed against the likelihood and magnitude of the potential danger to which failure to inspect would give rise) to inform the public entity whether the property was safe for the use or uses for which the public entity used or intended others to use the public property and for uses that the public entity actually knew others were making of the public property or adjacent property.

"(2) Whether the public entity maintained and operated such an inspection system with due care and did not discover the condition."

172

able that it will be used,'' (see also § 830.2)[7] we believe that a reasonable person could conclude that the Y intersection here involved created a substantial risk of injury to one using it in the manner of Mrs. Johnston. As she points out, the curving double line on Auburn was interrupted where Auburn intersected with Sylvan, and the attached diagram of the intersection coupled with the expert testimony of the basic hazards of the Y design, appear sufficient to support a verdict favoring her. (See *Teall* v. *City of Cudahy* (1963) 60 Cal.2d 431 [34 Cal.Rptr. 869, 386 P.2d 493] ; see also §§ 830.4, 830.8.)[8]

As noted, however, the county relies upon the plan or design immunity set forth in section 830.6. (See fn. 2 of *Cabell* v. *State of California, supra.*) Section 830.6 declares in pertinent part that a public entity is not liable for an injury caused by the plan or design of a construction of public property which has been approved in advance by a public body or employee exercising discretionary authority, if the trial or appellate court determines that *there is any substantial evidence* upon the basis of which a reasonable public employee or body could have adopted or approved the plan or design. The reasonableness is to be judged as of the time of the adoption or approval. (*Cabell* v. *State of California, supra.*)

The record in this case contains a copy of the plans of the intersection here involved, as recorded by the Recorder of Sacramento County in State Highway Map Book 3. Such plans on their face indicate that on July 11, 1927, they were

[7]Section 830.2: ''A condition is not a dangerous condition within the meaning of this chapter if the trial or appellate court, viewing the evidence most favorably to the plaintiff, determines as a matter of law that the risk created by the condition was of such a minor, trivial or insignificant nature in view of the surrounding circumstances that no reasonable person would conclude that the condition created a substantial risk of injury when such property or adjacent property was used with due care in a manner in which it was reasonably foreseeable that it would be used.''

[8]Section 830.4: ''A condition is not a dangerous condition within the meaning of this chapter merely because of the failure to provide regulatory traffic control signals, stop signs, yield right-of-way signs, or speed restriction signs, as described by the Vehicle Code, or distinctive roadway markings as described in Section 21460 of the Vehicle Code.''

Section 830.8: ''Neither a public entity nor a public employee is liable under this chapter for an injury caused by the failure to provide traffic or warning signals, signs, markings or devices described in the Vehicle Code. Nothing in this section exonerates a public entity or public employee from liability for injury proximately caused by such failure if a signal, sign, marking or device (other than one described in Section 830.4) was necessary to warn of a dangerous condition which endangered the safe movement of traffic and which would not be reasonably apparent to, and would not have been anticipated by, a person exercising due care.''

approved by F. W. Hazelwood, Division Engineer; Division III; Fred Quinn, Engineer, Surveys and Plans; and R. W. Morton, State Highway Engineer; and, further, that the work was completed in 1929 in accordance with the plans. The county engineer stated that at the time (1957) the state relinquished to the county the highway which includes the intersection no change had been made in the design and construction and that none had thereafter been made by the county prior to the accident here involved. There is also testimony that when the highway was built "they also had horses and buggies . . . [which] used to go up to Roseville and Auburn" on it, and that at that time "there weren't such things as schools and shopping centers and homes all over the place." It is thus apparent that there is substantial evidence upon the basis of which a reasonable public employee or body could have adopted or approved the plan or design in 1927, and that the judgment in the county's favor must be affirmed on this ground. Although Mrs. Johnston argues that the original plans upon which the county relies do not mention lighting or signs warning of the Y intersection, such items, which she now complains should have been provided at some point in time prior to her accident,[9] admittedly would serve only to lessen the hazard which she contends was created by the manner in which the intersection was designed, and for which section 830.6 extends immunity.

▇ With respect to cross-defendant Becker, Mrs. Johnston contends that the issues of negligence, contributory negligence and application of the last clear chance doctrine should have been submitted to the jury.

As already related, Becker was driving north on Auburn, a through street, at 35 to 40 miles per hour. He testified that he was familiar with the intersection, the night was dark, and his lights were on low beam. He saw the headlights of the Johnston car approaching him, was not sure of their distance from him, but assumed the Johnston car was approaching at the same speed and would continue around the curve of Auburn. No blinker signals were operating on the Johnston car and Becker had no means of anticipating it would leave the southbound lane and cut in front of him. He first realized the Johnston car was on the "wrong side of the road" when he was less than five feet from the point where Auburn meets Sylvan. The Johnston car was then about 100 feet from

---

[9]As already stated herein, there *were* two signs which Mrs. Johnston failed either to see or to observe.

Becker. He testified that "Just as I got up a little farther I saw she was coming right across in front of me, then I applied the brakes." Becker's car skidded 21 feet and came to rest on the right, or east, side of the center line of Auburn. The Johnston vehicle skidded 24 feet; the skid marks commenced at the double yellow line marking the center of Auburn. From the point at which Mrs. Johnston applied her brakes to the point of impact she was in the path of Becker's car and on his side of the road.

We are of the opinion that Becker could not reasonably be found negligent under such circumstances.

The judgment of nonsuit in favor of both cross-defendants is affirmed.

Traynor, C. J., McComb, J., Schauer, J.,* and Draper, J. pro tem.,† concurred.

PETERS, J. Concurring and Dissenting.—I concur in the holding of the majority that the evidence is sufficient to support a finding that there was a dangerous condition under section 835 of the Government Code, and I also agree that, as a matter of law, there is no evidence of negligence on the part of Frank Becker. I dissent, however, from the majority holding that section 830.6 of the Government Code, dealing with immunity of public entities for the plan or design of public improvements, grants immunity to the county for the maintenance of a dangerous condition after knowledge that its approved plan created such a condition. It follows that although it was proper to grant the nonsuit in favor of Frank Becker, the nonsuit in favor of the county should be reversed.

The proper interpretation of section 830.6 was discussed by me in my dissent in *Cabell* v. *State of California, ante,* p. 155 [60 Cal.Rptr. 476, 430 P.2d 34], and need not again be repeated. It was there urged that the immunity conferred by the section for the plan and design of public improvements does not grant public entities immunity for failure to maintain improvements free from defects and dangerous conditions disclosed by the actual operation of the improvements. In the instant case, the history of accidents at the intersection in the years immediately preceding the accident, and the expert testimony that this type of intersection is

---

*Retired Associate Justice of the Supreme Court sitting under assignment by the Chairman of the Judicial Council.

†Assigned by the Chairman of the Judicial Council.

a "classic" example of bad engineering[1] are sufficient to justify a finding that the county continued to maintain the dangerous condition after the actual operation had disclosed it.

In considering whether the intersection constituted a dangerous condition, it should be pointed out at the outset that there was no stationary lighting at the intersection, and that the intersection is not a true Y intersection. As shown by the map appended to the majority opinion, a motorist proceeding straight ahead southbound on Auburn will drive into Sylvan Drive. In a true Y intersection a motorist must turn his steering wheel before entering either arm of the Y, and if he does not he will go off the road.

Shortly before the accident, according to Mrs. Johnston's testimony, she observed a set of directly oncoming headlights on what appeared to be the other side of the road on which she was traveling. The obvious, if not the only, inference is that she saw a car approaching which she believed was on Auburn but in fact was on Sylvan. Any motorist driving at night in the exercise of due care would assume that, where he sees another automobile appear to be oncoming on a straight line on the other side of the road, his side of the road is also straight and does not curve unless there are clear circumstances indicating to the driver that the road in front of him is not straight but in fact curves. The main concern of a motorist driving at night on a highway without stationary illumination is to remain on the highway, and among the methods by which he determines whether the highway curves or is straight is by the movement of other cars. When he sees a car straight ahead, he reasonably can assume that the

[1] "Classic" is apparently used in the literal sense, namely, this type of intersection is used as a classroom example of bad engineering for engineering students.

The expert witness pointed out that as to a particular intersection dangerousness depends in part on the traffic volume and that a traffic count taken in 1961 showed an average of 11,800 vehicles a day traveling on Auburn Boulevard just north of Sylvan Road. Examination of the map appended to the majority opinion shows that so long as traffic is heavy there is not much danger that a driver southbound on Auburn will fail to realize that there is an intersection or believe that Sylvan is really a continuation of Auburn. When traffic is heavy, the pattern of moving cars will itself disclose the curve in Auburn. The danger becomes substantial when there is little traffic at nighttime because there is no stationary lighting, and the danger becomes acute, as will be demonstrated herinafter, when a car is approaching the intersection on Sylvan because the southbound motorist on Auburn may then be led to believe that Auburn continues into what is actually Sylvan and may not realize that Auburn turns.

highway does not curve in the absence of some clear evidence that his assumption is wrong.[2]

None of the circumstances here present, as a matter of law, required the trier of fact to conclude that a reasonable driver exercising due care could not believe that at the point of the accident Auburn continued straight ahead. The natural inference to be drawn from the fact that a car was approaching from straight ahead at least creates a conflict in the evidence. It is a factual question as to whether the Y sign and the curve sign on Auburn would or would not indicate to a reasonable driver that there was a curve in Auburn at the point involved, or whether a driver might reasonably believe that the Y intersection and the curve in Auburn were located beyond the approaching car. It is true that a reasonable driver proceeding southbound on Auburn would ordinarily observe cars, like the Becker car, which were northbound, but it certainly is foreseeable that because of the angle of approach a reasonable driver in the exercise of due care would assume that a northbound car was approaching on a side road a substantial distance beyond the intersection of the roads.

In short, the jury could properly conclude that the alignment and construction of the road created a dangerous condition. if not a trap, and that, in the light of the history of accidents at the intersection. the county maintained the dangerous condition after the actual operation of the improvements disclosed it.

I would affirm the judgment insofar as it grants a nonsuit to Frank Becker and reverse it insofar as it grants a nonsuit to the County of Sacramento.

Tobriner, J., concurred.

---

[2]The danger probably is not acute unless there is a third car, as here, proceeding northbound on Auburn. In the absence of such a car it would seem that the motorist who believes Auburn is straight will merely drive onto Sylvan, discover his error, and retrace his path. Likewise the danger is not so acute in the daytime when motorists in a situation such as that before us are not relying upon the lights of other cars to indicate the location of the highway. Finally the situation is not dangerous when there are numerous cars on the highway because their presence will indicate that Auburn. which is the major highway, curves at the intersection and that Sylvan is merely a side road.

Nevertheless it is clearly foreseeable that at nighttime there may be few vehicles on the road, that cars will approach the intersection in substantially the pattern involved here, and that the motorist proceeding southbound on Auburn in the exercise of due care will be misled by an automobile approaching from Sylvan into believing that Auburn proceeds directly into Sylvan.

The expert testimony also shows other dangers inherent in this type of intersection, but they need not be detailed here.