[No. F030478. Fifth Dist. Oct. 19, 1999.]

ROSARIO ALVAREZ, Plaintiff and Appellant, v.
THE STATE OF CALIFORNIA, Defendant and Respondent.

**COUNSEL**

Law offices of Thomas J. Brandi, Thomas J. Brandi and Terence D. Edwards for Plaintiff and Appellant.

William M. McMillan; George Cory; Manuel Alvarado; and Kenneth G. Nellis for Defendant and Respondent.

## OPINION

**THAXTER, Acting P. J.**—Appellant Rosario Alvarez was severely injured and her son was killed when a northbound vehicle, which had veered across the median, struck her southbound vehicle on State Route 99 (SR 99) in Kern County. Alvarez sued the State of California (State) alleging that the lack of a median barrier constituted a dangerous condition on public property. The trial court granted summary judgment for the State based on design immunity (Gov. Code, § 830.6).[1] Alvarez appeals from the judgment entered on that order contending: (1) the State failed to establish with competent evidence the discretionary approval of the plan element of design immunity and (2) even if the State established initial immunity, changed conditions defeated design immunity.

We reconsider our holding in *Bane v. State of California* (1989) 208 Cal.App.3d 860 [256 Cal.Rptr. 468], which interpreted the 1979 amendment to section 830.6. On reconsideration of the issue we hold that changed physical conditions are necessary to defeat design immunity. Design immunity is lost only if the design under changed physical conditions has produced a dangerous condition.

### FACTS AND PROCEDURAL HISTORY

The accident occurred 0.49 miles north of the Whistler Road overcrossing, between the Famoso exit and the McFarland/Sherwood Avenue exit. Between 1968 and 1970, that portion of the roadway was resurfaced and an additional northbound lane and a southbound lane were added pursuant to State Contract No. 06-032944 (the Project). The roadway then and now consists of six lanes of opposing traffic separated by a dirt median.

The State has erected median barriers on most of the 30 miles of highway between Bakersfield and Delano. However, there is a 3.42-mile stretch between post miles 45.20 and 48.62 without a barrier. The accident occurred within this segment.

*Median Barrier Warrants*

Median barriers result in a trade-off. They prevent nearly all cross-median accidents, but usually result in an overall increase in accidents and injuries. A median barrier is a fixed object which, when hit, can cause serious injury either by direct impact or by deflecting vehicles back into traffic. In addition, a barrier eliminates half the recovery area for out-of-control vehicles. Based on studies of the effectiveness of median barrier placement, California has developed a median barrier policy. The policy reflects the fact that as traffic volumes rise, the chance that an errant vehicle will cross the median

---

[1]Further statutory references are to the Government Code unless otherwise indicated.

and strike an opposing vehicle increases. But as the median reaches a certain width, it is less likely that those events will occur. With medians 46 feet or wider, regardless of traffic volume, the benefits of preventing cross-median accidents and injuries by barrier placement are outweighed by the disadvantages of the accidents and injuries generated by a barrier. The only exception to this rule is at those locations where there is a demonstrable history of excessive cross-median accidents: an accident rate of 0.12 fatal or 0.50 total cross-median accidents per mile per year.

The State policy—median barriers should be installed on freeways only if the result of striking the barrier is less severe than the result if no barrier existed—is reflected in median barrier warrants. There are two types of warrants, traffic volume/median width warrants (traffic volume/width warrants) and accident warrants. Traffic volume/width warrants index traffic volume to median width. Accident warrants index the frequency and severity of traffic accidents at a given locale with a state average. The California Department of Transportation (Caltrans) Traffic Manual described "warrants" as follows: "Warrants provide guidance to the engineer in evaluating the potential safety and operational benefits of traffic control devices and are based upon 'average' or 'normal' conditions. Warrants are not a substitute for engineering judgment. The fact that a 'warrant' for a particular traffic control or safety device is met is not conclusive justification for the installation of the device. The unique circumstances of each location and the amount of funds available for highway improvements must be considered in determining whether or not to install a traffic control or safety device."

Section 8-605.3 of the State Planning Manual sets forth the applicable warrants in effect when the Project was designed and built. The section provides that median barriers *may be* provided on freeways with medians less than 46 feet wide (a) on existing freeways if the average daily traffic (ADT) exceeds 40,000 vehicles, (b) on existing freeways if the ADT exceeds 20,000 vehicles and the median is 12 feet wide or less, (c) whenever there is an unusually high number or rate of cross-median accidents, or (d) on new construction whenever the anticipated ADT within two years of construction is estimated to be 40,000 vehicles or more.

The Project did not trigger the traffic volume/width warrant. The freeway segment was designed with a median width that varied from 65 to 41 feet, and the ADT was 22,500 vehicles and was not projected to be 40,000 vehicles or more within two years. The Project area also did not trigger the accident warrant. Thus, the 6.9-mile length of freeway was built without a median barrier in conformity with existing warrants, which were previously approved by the State.

When a freeway is built without a median barrier, the State monitors it annually to determine whether subsequent placement of a median barrier

may result in a safety benefit. Each year, through its Median Barrier Monitoring System, a "sophisticated computer program," the State reviews the entire State highway system and identifies those locations that meet the accident warrant and the traffic volume/width warrant. The State notifies each district of the road segments in its area that met either warrant based on data collected the previous year. The district engineers conduct detailed reviews and field investigations and recommend to the State whether or not a barrier should be installed at the identified locations. The State reviews the district recommendations for statewide uniformity and availability of funding and makes a final decision with the district regarding installation of a median barrier at the identified locations.

On June 22, 1995, the State's Median Barrier Monitoring System letter identified three locations on SR 99 in Kern County for investigation of the advisability of installing a median barrier. One 0.9-mile segment, identified from post mile 47.75 to post mile 48.62, encompassed the scene of Alvarez's accident. The median width for that segment varies from 65 feet to 41 feet. However, the State assigned the entire segment a width of 41 feet for monitoring purposes. The assigned width, coupled with the 1994 ADT volume of 37,500, brought that segment within the traffic volume/width warrant.

Pursuant to the Median Barrier Monitoring System, district engineers investigated that segment and concluded, "This section of highway is a 4-lane [*sic*: 6 lane] rural freeway. The ADT is 37,500 and our field investigation revealed a median width of 12.2 m. [41 feet]. This location meets the Volume-Median Width Warrants for median barriers." By letter of August 18, 1995, the district recommended the State construct a concrete median barrier from post mile 47.75 to post mile 48.62.

In November 1995, the State concurred with the district's recommendation to place a median barrier at that segment and prepared a project proposal. In January 1996, the State approved the conceptual report and the district began to develop the barrier project.

*The Accident*

Unfortunately, on July 29, 1995, five weeks after the State identified the road segment as a potential site for a median barrier, Priscilla Pangilinan, the driver of a northbound vehicle, lost control of her car and it veered across the median into the southbound lanes. The Pangilinan vehicle left the inside edge of the northbound lanes at post mile 47.83. The median is more than 60 feet wide at that point. The Pangilinan car entered the southbound travel lanes at post mile 47.88. The median is more than 45 feet wide at that point. The car struck Alvarez's southbound vehicle in the No. 3 (slow) lane. Pangilinan and Alvarez's son, a passenger in her vehicle, were killed. Alvarez sustained extensive injuries.

There were no cross-median accidents on the 1.25 miles of roadway from post mile 47.37 (Whistler Road overcrossing) to post mile 48.62 (the southern end of the concrete barrier) between January 1, 1986, and July 28, 1995. However, within the 3.42-mile surrounding area that lacked a barrier, there were seven cross-median accidents since 1989, including this one and a subsequent one.

*The Lawsuit*

Alvarez filed a complaint for damages against the State for creating a dangerous condition of public property by failing to provide a median barrier. The State moved for summary judgment on the ground of design immunity. The trial court granted the motion, finding there was discretionary approval of the design of the highway at the point of the accident with a median barrier considered and not included. And, Alvarez did not present substantial evidence of changed physical conditions to eliminate the design immunity defense. Traffic volume was less than design capacity, and the accident rate was less than expected.

## DISCUSSION

*Burden of Proof and Standard of Review*

█ Summary judgment is properly granted when the papers show there is no triable issue as to any material fact, and the moving party is entitled to judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c).) The defendant moving for summary judgment meets its burden of proof when it shows there is a complete defense to the action. (Code Civ. Proc., § 437c, subd. (*o*)(2).) Once the defendant does so, the burden shifts to the plaintiff to show the existence of a triable issue of fact with respect to that defense. (*Ibid.*) The moving party's affidavits are strictly construed and the opposing party's are liberally construed. (*Kulesa v. Castleberry* (1996) 47 Cal.App.4th 103, 112 [54 Cal.Rptr.2d 669].) We review de novo the trial court's decision to grant summary judgment. (*Ojavan Investors, Inc. v. California Coastal Com.* (1997) 54 Cal.App.4th 373, 385 [62 Cal.Rptr.2d 803].)

*Design Immunity*

█ The State is not liable for a defect in the design plan for a public improvement if it can establish the three elements that constitute the design immunity affirmative defense. The State must show: (1) a causal relationship between the project design and the accident; (2) discretionary approval of the design prior to construction; and (3) substantial evidence supporting the reasonableness of the design. (§ 830.6; *Sutton v. Golden Gate Bridge, Highway & Transportation Dist.* (1998) 68 Cal.App.4th 1149, 1158 [81 Cal.Rptr.2d 155] (*Sutton*); *Higgins v. State of California* (1997) 54 Cal.App.4th 177, 183-184 [62 Cal.Rptr.2d 459] (*Higgins*).) The trial court

applies the deferential "substantial evidence" standard traditionally employed by reviewing courts to determine whether any reasonable state official could have approved the challenged design. (*Ibid.*) The rationale underlying design immunity is to prevent a jury from reweighing the same factors considered by the governmental entity which approved the design. (*Baldwin v. State of California* (1972) 6 Cal.3d 424, 432, fn. 7, 434 [99 Cal.Rptr. 145, 491 P.2d 1121] (*Baldwin*).) Whether each element of design immunity exists is a question of law. (*Cameron v. State of California* (1972) 7 Cal.3d 318, 325 [102 Cal.Rptr. 305, 497 P.2d 777].)

Alvarez does not challenge the State's proof of the first and third elements. She contends the State failed to establish the second element, discretionary approval of the project design prior to construction. **(3a)** She also contends, even if the State established initial design immunity, the immunity was lost by changed conditions at the accident site.

■ 1. *The court did not err in finding that the State established discretionary approval of the plan prior to construction.*

Under the second element of design immunity, the public entity must establish that the dangerous feature of the design was approved by an "employee exercising discretionary authority to give such approval." (§ 830.6.) When the improvement has been in existence for a prolonged period of time, like the freeway at issue, the burden of proving details of the original design and documenting its official approval may be difficult. (Cal. Government Tort Liability Practice (Cont.Ed.Bar 3d ed. 1992) Dangerous Conditions on Public Property, § 3.55, pp. 370-372.)

*Evidence of Discretionary Approval*

To establish discretionary approval in this case, the State produced a copy of the "As Built Plans" for the Project and the declarations of former and current Caltrans employees. The employees described the discretionary approval process for roadway designs in general and for the Project in particular by interpreting the Project plans.

The Project plans state "Approved April 8, 1968" and are signed by "District Engineer R. E. Deffebach," "State Highway Engineer J. A. Legarra," "Deputy State Highway Engineer George Langsner," and "James A. Moe, Chief Deputy Director of Public Works for Samuel B. Nelson, Director of Public Works." The plans indicate the "Resident Engineer, R. V. Bergford" confirmed that the work was completed in 1970 in accordance with the plans.

■ "A signature is presumed to be genuine and authorized if it purports to be the signature, affixed in his official capacity, of [¶] . . . [a] public employee of any public entity in the United States." (Evid. Code, § 1453.) Given this presumption, the signatures of the various Caltrans engineers,

affixed in their official capacity as employees of the State, furnishes "evidence sufficient to sustain a finding" that the writings were what the State claimed them to be. (Evid. Code, § 1400, subd. (a).) Thus, the plans themselves provide evidence that the Project design was given the requisite discretionary approval prior to construction.

██ In addition to the Project plans, the State provided the declaration of Anthony J. Telesco, the Project engineer who prepared the plans. Telesco designed the 6.9-mile length of freeway without a median barrier in conformity with design and safety standards in effect at the time. The median barrier standards for the Project were set forth at section 8-605 of the State Planning Manual—Traffic. The design did not include a median barrier because the traffic volume/width warrant for new construction was not met. The ADT volume was only 22,500 vehicles and was not projected to be 40,000 vehicles or more within two years.

Telesco further declared, after he signed off on the plans, his boss, design engineer George Fluter, reviewed the design features of the plans to ensure the Project was designed according to prevailing standards. Fluter then approved the plans and forwarded them through deputy district engineer L. S. VanVorhees to the district engineer R. E. Deffebach for his approval and signature. Fluter and Deffebach exercised their discretionary authority to approve the plans by permitting them to proceed to the next level for approval. Both engineers could have rejected the plans by refusing to sign them, thereby requiring Telesco to redesign the Project plans to meet what they felt was the correct design.

The State also provided a declaration from former Caltrans employee Kenneth C. Berner. Berner was a registered professional civil engineer and registered professional traffic engineer with Caltrans from 1966 through 1992. He had retired from Caltrans in 1992 and was now a partner in an engineering firm specializing in the technical aspects of traffic engineering. Throughout his career at Caltrans, Berner was directly or indirectly involved in the design process. He had designed state highways and had his work reviewed and approved by senior civil engineers. Later, he had reviewed designs prepared by district engineers to ensure capacity, safety and operational adequacy and had made recommendations regarding median barrier installations.

Based on his lengthy employment with Caltrans, his design work responsibilities and his familiarity with the design review and approval process, Berner described the State's custom and practice in providing discretionary approval of roadway designs during the late 1960's when the Project was designed and constructed. Berner stated he was "personally familiar" with the four state officials who approved and signed the Project plans. Those

officials had the discretionary authority to approve the Project plans. Their signatures showed they in fact exercised their discretionary authority and approved the plans.

Based on Berner's review of the Project plans, his familiarity with the design review process and his knowledge of the custom and practice of the review and approval process, he declared that the Project approval process was as follows: design engineer George Fluter reviewed the design features of Telesco's plans to ensure the plans had been designed according to prevailing standards contained in the relevant planning manuals and then approved the plans. The plans were forwarded through deputy district engineer L. S. VanVorhees to district engineer R. E. Deffebach for his approval and signature. Deffebach forwarded the plans to headquarters addressed to deputy state highway engineer George Langsner, whose staff independently reviewed the plans for conformity to appropriate standards. Langsner then approved the plans based on his staff's review and forwarded the plans to the State Highway Engineer, John A. Legarra, and the Director of Public Works, Samuel B. Nelson, for their approval and signatures. In this instance, James A. Moe, the deputy director of public works, signed for Samuel B. Nelson. The signatures of those officials and their official capacity are on the design plans.

Berner further declared the State officials who signed and approved the plans had two options. They could, as they did, exercise their discretionary authority and approve the plans, thereby permitting the plans to proceed to the next level. In the alternative, they could reject the plans by refusing to sign them and thereby force the plans to be altered to reflect what they felt was the correct design. Berner concluded, because the Project plans met the 1968 standards of design, the State officials' decisions to sign the plans and have them proceed to the next level was reasonable.

*Adequacy of the Evidence*

Alvarez asserts that no admissible evidence established that the 1968 plans were approved prior to construction. First, she contends the State must establish design immunity with declarations from the individuals who were actually involved in the design and approval of the Project. She relies on several design immunity cases where the person who approved the plan supplied the declaration or testimony supporting the defense. (E.g., *Uyeno v. State of California* (1991) 234 Cal.App.3d 1371, 1378 [286 Cal.Rptr. 328]; *Hefner v. County of Sacramento* (1988) 197 Cal.App.3d 1007, 1012 [243 Cal.Rptr. 291]; *Ramirez v. City of Redondo Beach* (1987) 192 Cal.App.3d 515, 524 [237 Cal.Rptr. 505].) However, these cases do not consider who is

a proper party to testify to discretionary approval, and there are a number of cases where such testimony was supplied by persons who were not personally involved in the design and/or approval process for the subject project. (See *Baldwin, supra,* 6 Cal.3d at p. 430 [declarations of two engineers, who had worked on the planning and construction of the project, that project was approved by the then district engineer and the then state highway engineer]; *Cameron v. State of California, supra,* 7 Cal.3d at p. 325 [present county surveyor testified that plans were prepared in the 1920's by the then county surveyor, and copies of the board of supervisor's minutes demonstrated the plans were approved by the board]; *Higgins, supra,* 54 Cal.App.4th at pp. 181-182 [declaration by long-term Caltrans employee that plans were approved by the district engineer, engineer of design, deputy district engineer and assistant state highway engineer]; *Bay Area Rapid Transit Dist. v. Superior Court* (1996) 46 Cal.App.4th 476, 479 [53 Cal.Rptr.2d 906] [declaration by BART engineer that design was approved by independent consulting firm of engineers].) Thus, appellant's premise—that discretionary approval can only be established by a percipient witness—is not supported inferentially by case law.

Second, Alvarez claims that Berner and Telesco cannot testify that the Project plans received the requisite discretionary approval. They did not approve the plans, they were not present when the plans were signed and they did not subsequently talk to the persons who signed the plans. Thus, both men lacked personal knowledge of the Project's discretionary approval, the State's custom and practice during the relevant period, the responsibilities of the various people involved, and what considerations went into the Project's design. Alvarez's evidentiary challenges are without merit.

a. *Personal Knowledge/Competence*

■ Except to the extent that an expert witness may give opinion testimony not based on personal knowledge, the testimony of a witness concerning a particular matter is inadmissible unless the witness has personal knowledge of that matter. (Evid. Code, § 702, subd. (a).) Personal knowledge means a present recollection of an impression derived from the exercise of the witness's own senses. (*People v. St. Andrew* (1980) 101 Cal.App.3d 450, 458, fn. 3 [161 Cal.Rptr. 634].) A witness cannot competently testify to facts of which he or she has no personal knowledge. (*Snider v. Snider* (1962) 200 Cal.App.2d 741, 753-754 [19 Cal.Rptr. 709].)

Telesco prepared the plans for the Project, so the court can reasonably infer from the face of his declaration that he had personal knowledge as to whether his superiors approved his plans.

Berner did not personally approve the Project design. However, based on his employment experience, he had the requisite expertise to testify to the State's discretionary approval custom and practice. (*Alber v. Owens* (1967) 66 Cal.2d 790, 800 [59 Cal.Rptr. 117, 427 P.2d 781] [expert could testify concerning custom and practice in the industry regarding use of guard rails on construction platforms]; *Blinkinsop v. Weber* (1948) 85 Cal.App.2d 276, 283 [193 P.2d 96] [expert could testify as to whether steps were built in accordance with standard practice].)

■ The design and construction of highways, including the discretionary approval of project plans, is beyond the common experience of the trier of fact. It is thus the proper subject of expert testimony. (Evid. Code, § 801, subd. (a).) Berner had the requisite expertise to explain the Project's discretionary approval process as indicated by the Project plans. "A person is qualified to testify as an expert if he has special knowledge, skill, experience, training, or education sufficient to qualify him as an expert on the subject to which his testimony relates." (Evid. Code, § 720, subd. (a).) As an expert, Berner could competently testify to the State's custom and practice of discretionary design review and approval during the relevant time period. He could competently interpret and explain the Project plans, identify the officials involved in the review and approval process at the district and state level, and explain their role in the discretionary approval process even though he was not personally involved in the Project's approval.

The Supreme Court rejected an argument analogous to Alvarez's in *Brown v. Colm* (1974) 11 Cal.3d 639 [114 Cal.Rptr. 128, 522 P.2d 688], a medical malpractice action. The trial court refused to permit an expert witness to testify to the standard of care prevailing in 1949. The trial court excluded the expert's testimony on the grounds he was not personally acquainted with the standards in 1949 because he did not become a physician until 1959 and his opinion was based solely on a review of medical literature. The Supreme Court held this was error. While a layperson could not testify to a fact learned only by reading a book, a physician could rely on medical texts as a basis for his or her testimony. (*Id.* at p. 644.) Analogously, Berner could testify to the approval process at the time the Project was approved, even though he was not involved in the process at the time, based on his later acquired knowledge of the process.

Accordingly, the declarations of Telesco and Berner were not inadmissible on lack of personal knowledge and lack of competence grounds.

b. *Hearsay/Speculative Evidence*

In a related argument, Alvarez contends that because Berner and Telesco were not personally involved in the approval of the Project's design, their

declarations constitute hearsay and are speculative. Hearsay is evidence of a statement made out of court and offered to prove the truth of the matter stated. (Evid. Code, § 1200.) Alvarez fails to identify any sentence in either declaration that is an out-of-court statement offered to prove the truth of the matter stated. Thus, her hearsay objection is without merit. The speculation objection fares no better. Telesco's statement that George Fluter reviewed and approved the Project plans he drew is based on his personal knowledge of the design review process and the reasonable inference he drew from the fact that the plans were not returned to him for redesign. Berner's statements regarding the review and approval process were based on his personal knowledge of the State's discretionary approval process custom and practice and his expert interpretation of the signed Project plans. Such testimony is not speculative.

c. *Character Evidence*

Finally, Alvarez contends the custom and practice statements are inadmissible under Evidence Code section 1101. Not so; Evidence Code section 1101 provides that evidence of a person's character or a trait of character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his or her conduct) is inadmissible when offered to prove conduct on a specified occasion. Statements regarding the State's custom and practice as to the discretionary approval of roadway designs are not inadmissible character evidence. Moreover, evidence of custom and practice in a business is admissible as circumstantial evidence of conduct on a particular occasion. (See 1 Witkin, Cal. Evidence (3d ed. 1986) Circumstantial Evidence, § 394, p. 368.) Accordingly, appellant has not demonstrated that the Telesco and Berner declarations were inadmissible.

■ In summary, the Project plans indicate the design was approved prior to construction by at least four State officials whose stated capacities indicate they had the discretionary authority to approve the plans. This evidence, coupled with Telesco's and Berner's declarations explaining the custom and practice of design review and approval and identifying the signing parties, was substantial evidence of discretionary approval. In *Becker v. Johnston* (1967) 67 Cal.2d 163, 172-173 [60 Cal.Rptr. 485, 430 P.2d 43], disapproved on other grounds in *Baldwin, supra*, 6 Cal.3d 424, the record contained a copy of the plans of the intersection involved. The face of the plans indicated that on July 11, 1927, they were approved by F. W. Hazelwood, division engineer; Fred Quinn, engineer, surveys and plans; and R. W. Morton, the State Highway Engineer. The Supreme Court concluded this was substantial evidence on the basis of which a reasonable public employee could have adopted or approved the roadway design.

Discretionary approval simply means approval in advance of construction by the officer exercising discretionary authority. (*Ramirez v. City of Redondo Beach, supra*, 192 Cal.App.3d at p. 526.) " '[A] detailed plan, drawn up by a competent engineering firm, and approved by the city council in the exercise of its discretionary authority, is certainly persuasive evidence of both elements of prior approval and reasonableness for purposes of the design immunity defense.' " (*Ibid.*, italics omitted.) Analogously, a detailed plan, drawn up by a registered professional civil engineer, and approved by four district and State officials in the exercise of their discretionary authority is sufficient to establish the prior approval element of design immunity.

As Alvarez does not challenge the evidence establishing the reasonableness of the design, *Hefner v. County of Sacramento, supra*, 197 Cal.App.3d 1007, 1015, is inapplicable.

*Evidence That a Barrier Was Considered*

Alvarez argues, because Berner had no knowledge as to what the engineers who designed the roadway considered with respect to a median barrier, there was no evidence a median barrier was considered and rejected. She is mistaken.

The 1967 preliminary report for the proposed Project, sent from district engineer R. E. Deffebach to State Highway Engineer J. C. Womack, shows that the freeway improvement was designed without a median barrier. The reasonable inference from the report is that omission of the barrier was a conscious decision in conformance with existing policies set forth in the State Planning Manual—Traffic section 8-605, entitled Median Barriers. The inference is supported by the as built plans which demonstrate the freeway was constructed without a median barrier in accordance with the approved plans.

Further, Telesco stated he prepared the plan without a barrier in conformance with the applicable standard and warrants. Berner attested that the plans show that a median barrier was neither planned nor constructed. The barrierless design conformed to the State's median barrier installation standard as it existed in the late 1960's and at the time of Alvarez's collision. Alvarez concedes a median barrier was not warranted when the freeway was constructed.

The Telesco and Berner declarations together with the documentary evidence constitute substantial evidence the absence of a median barrier " 'was the result of or conformed to a design approved by the public entity vested

with discretionary authority.' " (*Higgins, supra,* 54 Cal.App.4th at p. 186, citing *Cameron v. State of California, supra,* 7 Cal.3d at p. 326.)

Finally, Alvarez's claim that the State's evidence must show what factors the State weighed in deciding to install a median barrier and what factors ultimately persuaded the engineers that a median barrier would not be appropriate is without merit. Nothing in section 830.6 or subsequent case law requires such a detailed showing to establish the discretionary approval element of design immunity. *Johnston v. County of Yolo* (1969) 274 Cal.App.2d 46 [79 Cal.Rptr. 33] and *Levin v. State of California* (1983) 146 Cal.App.3d 410 [194 Cal.Rptr. 223] do not support Alvarez's claim. In *Johnston,* the court rejected the signed plans as evidence of the requisite discretionary approval because the signing engineer testified he signed the plans under political duress and contrary to his professional judgment. In *Levin,* the design plan did not indicate the steep slope of the embankment created by the design, and the state failed to show that the official who exercised the discretionary authority to approve the roadway design was aware the roadway did not conform to standards. There is no equivalent evidence in this case. The barrierless Project design conformed to the State's median barrier standards.

2. *The State did not lose design immunity under the "changed conditions" exception.*

From 1968 to 1995 the volume of traffic at the location of the accident increased from 22,500 to 37,500 vehicles per day. However, the ADT was still substantially below the 50,500 vehicles per day design capacity of the freeway. In addition, although the parties disputed what segment of freeway should be used to calculate accident history, Alvarez conceded the accident warrant criteria were not met and the actual accident rate for the roadway segment where the accident occurred was 35 percent less than the expected rate. Nevertheless, she contends design immunity was lost when traffic volumes triggered the traffic volume/width warrant, district engineers recommended the installation of a barrier, and State officials approved a barrier at the accident site.

*Loss of Design Immunity*

Early cases construing section 830.6 held that design immunity would apply perpetually even though changed circumstances clearly revealed the defects of the plan. (*Baldwin, supra,* 6 Cal.3d at p. 427.) ██ In *Baldwin,* the Supreme Court abandoned this position and held "[o]nce the entity has

notice that the plan or design, under changed physical conditions, has produced a dangerous condition of public property, it must act reasonably to correct or alleviate the hazard." (*Id.* at p. 434, fn. omitted.) Thus, ". . . where a plan or design of a construction of, or improvement to, public property, although shown to have been reasonably approved in advance or prepared in conformity with standards previously so approved, as being safe, nevertheless in its actual operation *under changed physical conditions* produces a dangerous condition of public property and causes injury, the public entity does not retain the statutory immunity from liability conferred on it by section 830.6." (*Id.* at p. 438, italics added.)

In 1979, the Legislature amended section 830.6 and added: "Notwithstanding notice that constructed or improved public property may no longer be in conformity with a plan or design . . . which reasonably could be approved by the legislative body or other body, or employee, the immunity provided by this section shall continue for a reasonable period of time sufficient to permit the public entity to obtain funds for and carry out remedial work necessary to allow such public property to be in conformity with a plan or design approved by the legislative body of the public entity or other body or employee." (Stats. 1979, ch. 481, § 1, p. 1638.)

The 1979 amendment "could have been drafted with more clarity." (*Bane v. State of California, supra,* 208 Cal.App.3d at p. 870 (*Bane*).) In *Bane,* this court held that the 1979 amendment nullified the *Baldwin* language requiring changed physical conditions before an approved design may be deemed unreasonable. We held that design immunity terminates "if the subsequent history shows the design was unreasonable *for any reason* once the public entity has notice of the dangerous condition and has a sufficient time period to remedy it." (*Bane, supra,* at p. 871, italics added.) Alvarez, relying on this language, contends the trial court erred when it found she had to show changed physical conditions to defeat design immunity.

Several courts have disagreed with *Bane.* (See, e.g., *Sutton, supra,* 68 Cal.App.4th at pp. 1163-1164; *Grenier v. City of Irwindale* (1997) 57 Cal.App.4th 931, 945 [67 Cal.Rptr.2d 454] (*Grenier*); *Compton v. City of Santee* (1993) 12 Cal.App.4th 591, 598-599 [15 Cal.Rptr.2d 660].) On reconsideration of the amendment in light of its legislative history, we conclude that *Bane*'s holding is too broad. As one commentator noted, ". . . the amendment does not define the circumstances under which the design immunity is lost; rather, it specifies the circumstances under which it may be retained." (Fisher, *Design Immunity for Public Entities* (1991) 28 San Diego L.Rev. 241, 257.) The *Grenier* court correctly noted that nothing in the legislative history of the amendment reflects an intent to expand *Baldwin* and

to extinguish design immunity in a situation other than changed physical conditions. Rather, the legislative history indicates the amendment was intended to respond to *Baldwin* by providing a reasonable extension of design immunity when, under *Baldwin*, that immunity otherwise would be lost. (See, e.g., letter from Assemblyman John Knox to Governor Brown regarding Assem. Bill No. 893 (1979-1980 Reg. Sess.) Aug. 30, 1979 ["Although the staff of the Joint Committee on Tort Liability agreed with *Baldwin*, it felt there should be some recognition of the practical limitations which have been imposed upon governments by Article XIII A of the California Constitution (Proposition 13) and ever increasing liability insurance costs."]; *Sutton, supra*, 68 Cal.App.4th at pp. 1163-1164.) Thus, we too conclude that design immunity may be lost by evidence that the design under changed physical conditions has produced a dangerous condition.

Alvarez next contends that the doubled traffic volumes, which triggered the traffic volume/width warrant, constitute changed physical conditions that defeat design immunity. She acknowledges that the actual recommendation and decision to install a median barrier came after the July 1995 accident. However, she submits, since both were based on traffic volume information collected in 1994, there is at least a triable issue of fact as to whether the State had prior notice of the changed conditions that created the dangerous condition. Thus, the trial court erred when it found no substantial evidence of changed physical conditions.

■ Alvarez's argument is flawed. First, while increased traffic volume may constitute changed physical conditions (*Bane, supra*, 208 Cal.App.3d at p. 871; but see *Higgins, supra*, 54 Cal.App.4th at p. 188 [mere increase in traffic volume is not a changed physical condition]), design immunity is not lost simply because the design is operating under changed physical conditions. There must be evidence that the design, under changed physical conditions, has produced a dangerous condition of which the State is aware. (*Baldwin, supra*, 6 Cal.3d at pp. 434, 438; *Dole Citrus v. State of California* (1997) 60 Cal.App.4th 486, 494 [70 Cal.Rptr.2d 348] (*Dole Citrus*).)

" 'Dangerous condition' means a condition of property that creates a substantial . . . risk of injury when such property or adjacent property is used with due care in a manner in which it is reasonably foreseeable that it will be used." (§ 830, subd. (a).) For example, an improvement may come to constitute a dangerous condition if increased traffic at the site, coupled with an aberrant accident history, indicates its dangerousness. (See, e.g., *Baldwin, supra*, 6 Cal.3d at pp. 428-429 [13 accidents in six months; intersection accounted for 14 percent of all traffic fatalities in the city]; *Bane, supra*, 208 Cal.App.3d at pp. 872-873 [intersection averaged twice as many accidents as

similar intersections in the state; in the previous 18 months, 47 accidents resulted in five deaths and 89 injuries].) In contrast, Alvarez contends, notwithstanding the unremarkable accident history at the site, once traffic volume triggered the State's volume/width warrant, a median barrier was "mandated" and its absence created a dangerous condition. The record belies this contention.

The traffic volume/width warrants reflect policy decisions based on statistical averages that indicate at what point the installation of a median barrier will probably provide more benefit than detriment. The warrants do not reflect a determination that the lack of a barrier creates a dangerous condition. In fact, the warrants recognize that median barriers increase the probability of accidents. Thus, the warrants mandate, at a given traffic volume, an investigation of the advisability of installing a barrier; they do not mandate the installation of a median barrier.

Moreover, a recent nationwide survey of barrier placement practices in other states revealed no state placed barriers more liberally than California. And, in contrast to California's median barrier warrants that mandate barrier consideration for medians up to 46 feet wide, the American Association of State Highway Transportation Officials, a national engineering association, mandates barrier consideration only for medians up to 30 feet wide. This variation supports the conclusion that the absence of a barrier on a median that varied from 41 to 65 feet, regardless of traffic volumes, did not constitute a dangerous condition absent an aberrant accident history at the location. Thus, the record does not support Alvarez's claim that the lack of a barrier created a dangerous condition once ADT flow increased sufficiently to trigger the traffic volume/width warrant.

Second, that the State has erected barriers on other segments of SR 99 and that Caltrans engineers recommended that a barrier be installed at the accident site do not constitute admissions that the lack of a barrier created a dangerous condition. Appellant's argument is similar to one rejected in *Dole Citrus, supra*, 60 Cal.App.4th 486. A Dole employee, who was driving on Interstate 10, was severely injured when a person jumped from an overcrossing and crashed through his windshield. Dole sought to recover from the State the workers' compensation benefits it paid, on the theory the freeway overcrossing, designed in 1958, constituted a dangerous condition because the guardrail was too low to prevent objects from falling onto the freeway below. (*Id.* at p. 489.)

State documents showed the State had considered installing protective screening on highway overpasses since 1969, had instituted a policy in 1972

calling for the installation of protective screening on all new overcrossings in urban areas, and had installed screening on several other Interstate 10 overcrossings. In addition, in 1971, the Legislature had adopted Streets and Highways Code section 92.6, which provided that screening shall be installed on appropriate freeway overpasses with first consideration given to urban areas. Finally, the current State design manual stated: " 'To prevent objects from being dropped or thrown upon vehicles, protective screening . . . should be installed along new overcrossing structure sidewalks in urban areas. . . . Screening should be installed at such other locations determined to be appropriate.' " (*Dole Citrus, supra,* 60 Cal.App.4th at pp. 491-492.)

Dole argued that the statute and the State's subsequent attempts to comply with it constituted a recognition that unscreened overcrossings are a dangerous condition, and a conclusion that circumstances had changed, such that the original design immunity ended. (*Dole Citrus, supra,* 60 Cal.App.4th at p. 491.) The court disagreed. Dole's evidence merely established the State's general concern with deaths and injuries resulting from objects thrown or dropped from freeway overpasses. (*Id.* at pp. 492-493.) The change in the design manual did not show that the earlier design created a dangerous condition. That the original overcrossing design could have been made safer was irrelevant. (*Id.* at p. 494.)

The same is true in this case. That the State has erected median barriers on other portions of SR 99 merely demonstrates the State's concern with deaths and injuries resulting from cross-median accidents. Unlike the fencing at issue in *Dole Citrus,* however, which probably had no countervailing considerations other than financial, median barriers increase the likelihood of accidents at the site. Thus, rather than simply install barriers on every median, the State has taken the more scientific approach set forth in the warrants. It uses the traffic volume/width and accident warrants to identify freeway segments where the benefit of a barrier may outweigh the expected detriment. However, the State's determination that benefit now outweighs detriment and a barrier is indicated does not constitute a determination that the barrierless median is a dangerous condition or that conditions have changed so that design immunity has ended. Neither the installation of other median barriers nor the determination and recommendation to install a barrier at the site of the accident constitute an admission that the median on July 29, 1995, was a dangerous condition.

Alvarez failed to establish a triable issue of fact as to changed conditions that would defeat the immunity conferred by the original design. Summary judgment was properly granted in favor of the State on the design immunity affirmative defense.

## DISPOSITION

Judgment affirmed. Costs to respondent.

Harris, J., and Cornell, J.,* concurred.

---

*Judge of the Merced Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.