Filed 7/29/16  P. v. Toledo CA2/1

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>JOE TOLEDO et al.,<br><br>    Defendants and Appellants. | B251833<br><br>(Los Angeles County<br>Super. Ct. No. TA097537) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Allen J. Webster, Judge.  Affirmed as modified.

Allen G. Weinberg, under appointment by the Court of Appeal, for Defendant and Appellant Joe Toledo.

Jeralyn Keller, under appointment by the Court of Appeal, for Defendant and Appellant Jose G. Enciso.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Michael R. Johnsen, Joseph P. Lee and Kathy S. Pomerantz, Deputy Attorneys General, for Plaintiff and Respondent.

_____

A jury convicted Joe "Leon" Toledo and Jose G. "Evil" Enciso of the first degree murder of Darryl White and found gun and gang allegations true. Appellants were sentenced to state prison for 50 years to life, but we reversed their convictions on the ground that the trial court abused its discretion by admitting extensive, detailed, inflammatory, and overwhelmingly irrelevant gang evidence. (*People v. Toledo* (Oct. 5, 2011, B219800) [nonpub. opn.].) Appellants were retried and reconvicted, and again appeal, arguing the trial court made voir dire and evidentiary errors, reimposed restitution fines that were excessive or had been paid after the first trial, and failed to give sufficient custody credit to Toledo.

We conclude the fines must be reduced and Toledo given additional custody credit, but otherwise affirm.

## BACKGROUND

Several street gangs claim overlapping territory in Compton, California, including the Compton Varrio 70 (CV70) and Leuders Park Piru (Leuders Park) gangs. Appellants were members of CV70. White, was a member of Natural Born Players (NBP), a group associated with Leuders Park. The CV70 and Leuders Park gangs maintain a longstanding feud.

On the morning of November 27, 2002, the day after Thanksgiving, White and his cousin, Brandon Buckhalter, spray painted "NBP" on some walls and a street sign at the intersection of San Vicente and Bradfield avenues in Compton. White also painted over a graffito referring to CV70.

Toledo saw or learned of White and Buckhalter defacing the CV70 graffiti and hurriedly obtained a revolver from the home of David Guerrero, a fellow CV70 member. Appellants then approached White and Buckhalter in a blue Chevy Tahoe driven by Enciso. When Enciso flourished a chrome handgun, White and Buckhalter fled on foot onto Palmer Street. Appellants pursued in the Tahoe but temporarily lost sight of the NBP members.

White and Buckhalter ran to a friend's house and went inside, for a time thinking they had eluded appellants. But when White left the house to reconnoiter he was seen by

2

Toledo and Mario Contreras, also a CV70 member. White ran into the backyard of a neighboring house, closely pursued on foot by Toledo and Contreras. One of the pursuers shouted, "Yeah, mother fucker. You think you got away, but we got you now." Toledo and Contreras took different routes to the backyard at 1813 East Palmer Street, cornered White, and shot him five times with two guns, a revolver and a semiautomatic, twice through the heart. Then they ran back to the Tahoe and were driven away. White died at the scene.

The police investigation spanned several years.

Months after the shooting, Danny Guerrero, David Guerrero's brother, was stopped in his vehicle. Under a seat, police discovered a semiautomatic handgun that was later determined to have ejected the shell casings recovered at the scene of the White shooting.

Enciso was arrested three years after the murder, on November 9, 2005. Toledo was arrested two months after that.

In 2006, Melina Rodriguez, David Guerrero's girlfriend, was arrested for drug possession. She told police that on an unspecified day when an unidentified "Black guy got killed," she had been living with Guerrero near the intersection of San Vicente and Bradfield, where White and Buckhalter were seen painting graffiti. She was in the house with Guerrero while Enciso, Toledo and Contreras were outside. Toledo rushed in and told Guerrero to give him a gun. Guerrero gave Toledo a chrome revolver, then ran outside with him. She could not otherwise identify the gun. Rodriguez heard shots five minutes later. She was later told by a neighbor that a Black man had been killed. In a later interview, Rodriguez told police that Enciso drove a blue Tahoe owned by Danny Guerrero, the same kind of car that had pursued White and Buckhalter. Rodriguez recanted her statements at the preliminary hearing and at trial, but recorded clips of the interview were played for the jury.

Also in 2006, police detained Danny Guerrero as he emerged from the house of Sabrina Lewis, his girlfriend, with duffle bags. A search of the bags and of Lewis's residence recovered armor-penetrating ammunition, a preliminary hearing transcript of

3

Buckhalter's testimony in an unidentified case, and a CD recording of a police interview with Toledo.

Buckhalter identified Toledo and Contreras as the shooters and Enciso and David Guerrero as the Tahoe's driver and passenger, respectively.

Sheriff's Detectives Peter Hecht and Brian Steinwand, the prosecution's gang experts, testified that a task force was created in 2005 to solve crimes associated with CV70. Hecht testified CV70's primary activities are robbery, illegal substance dealing, car theft and murder. He testified there was a longstanding feud between CV70 and Leuders Park, in furtherance of which numerous violent crimes were committed by CV70 members before and after the White murder. For example, in November 2001, Ricki Jimenez, the sister of a CV70 gang member, was murdered. It was suspected in the community that the murder was committed by members of the Ferguson family (of which White and Buckhalter were members), several of whom belonged to Leuders Park.

Hecht testified that gangs demand respect and announce their geographical authority with graffiti. In the gang culture, crossing out a rival gang's graffiti is a sign of disrespect and requires retaliation. A gang member loses respect by failing to retaliate when a gang's authority is challenged, and can be killed for cooperating with law enforcement. Hecht opined that the White murder benefitted CV70 by increasing its reputation for violence and intimidating the community, thereby discouraging community members from assisting law enforcement in its investigations of CV70 activities.

Steinwand interpreted an inculpatory recorded jailhouse conversation involving Enciso, Contreras, and David and Danny Guerrero. In the conversation, the CV70 members comment that Buckhalter was cooperating with police about a case on Palmer Street.

Enciso's defense was alibi, his in-laws testifying he was with them in the San Diego area for a family Thanksgiving at the time of the murder. Toledo's defense was also alibi, his brother testifying Toledo was in school at the time of the murder.

A jury found appellants guilty of the White murder and found true the gun and gang allegations. The trial court sentenced them to 50 years to life in prison, comprising

4

25 years to life for the murder plus a consecutive 25 years for the gun enhancement, and imposed but stayed sentences for the gang enhancement. The court also imposed various fines and conditions, including a $280 restitution fine and a $280 parole revocation fine. Both appellants timely appealed.

**DISCUSSION**

**A.     Voir Dire**

Appellants argue the trial court violated their Sixth Amendment right to a fair trial by making comments during voir dire that discouraged prospective jurors from providing truthful answers regarding religion and language ability. They also argue the court erred in failing to dismiss for cause a statutorily ineligible prospective juror. We conclude appellants forfeited the claims by failing to raise them during voir dire, and in any event they lack merit.

In opening remarks to prospective jurors, the trial court stated any juror's excuse to avoid jury duty would be examined closely. For example, the trial court remarked that religious belief, certainly not Christian belief, would likely not be an effective excuse.[1] The court also stated that a professed inability to speak or understand English would be closely tested.[2] Additionally, when a juror stated he was a "line reserve" police officer

---

[1] The court said, "Now we have people that will tell us that because their religion and Bible says this and all that they can't serve. That is wrong. [¶] First of all, if you recall I mentioned the name Roger Mahoney. . . . He was the Cardinal for the Catholic Archdiocese of L.A. County. He served nine days on a jury panel. So if he can serve . . . , you can serve too. . . . So there's no reason why you can't serve if you are selected because of any sort of religious belief. If you think somehow the Bible says you can't serve, bring a Bible that says you can't serve. Thou shall not serve on jury duty. We'll cut you loose. Because there's nothing nowhere in the 64 books of the Bible. So we don't want to hear about what your religion says, what the Bible says, because it's not in there, okay."

[2] The court said, "If . . . you tell us that you can't serve because you don't understand enough English or this is your second language, whatever the reason you come up with, we have a test to see who's telling us the truth, who's lying. We can figure it out. And if we believe that you are running a game on us, we have a way of

5

working out of Hollenbeck station, the trial court did not immediately dismiss him for cause, leaving it to Toledo to use a peremptory challenge to excuse him. "The bottom line," the court stated, was that "since we have the one-trial system we can't excuse you like we did in the past."

### 1.	The Claims of Error are Forfeited

A defendant's failure to object to the manner in which a trial court conducts voir dire forfeits any claim of error on appeal. (*People v. Cunningham* (2015) 61 Cal.4th 609, 635 [failure to raise claim of statutory error in the trial court forfeits the claim on appeal]; *People v. Tully* (2012) 54 Cal.4th 952, 996.) Here, appellants failed to object to the trial court's remarks during voir dire, and therefore forfeited any claim that the remarks resulted in an unfair trial.

Appellants acknowledge they failed to object, but urge us to reach the merits of their claims pursuant to *People v. Abbaszadeh* (2003) 106 Cal.App.4th 642, which held failure to object during voir dire may be excused where an objection would have been futile or the trial court effectively ordered that prospective jurors violate their oath to tell the truth or the error was such as would affect the defendant's substantial rights. (*Id*. at p. 649; see Pen. Code, § 1469 [an appellate court may "review any instruction given, refused or modified, even though no objection was made thereto in the trial court"].) Appellants argue objection here would have been futile because the trial judge informed jurors he always made the same remarks as a matter of routine to prospective jurors. The argument is without merit.

From one venire to the next, prospective jurors generally voice similar concerns and operate under similar misconceptions about jury duty. In the face of repetitive queries, it is entirely unremarkable that an experienced trial judge would develop and routinely give a uniform set of instructions addressing these concerns. But simply because an instruction is routine does not mean an objection to it will be rejected. Our

---

dealing with that, okay. So I'm telling you right off the bat, those of you who claim you don't understand enough English to participate, we have a way to [detect] that, okay. So I'm telling you, don't go there. We can deal with it if we have to."

trial judges are not so set in their ways and sclerotic in their thinking as to be impervious to fine-tuning their preferred instructions.

Appellants also argue these voir dire errors affected their "substantial rights and the structural integrity of the trial." We disagree, as appellants identify no such substantial rights or structural infirmity, and we discern none. In essence, appellants argue the trial court's voir dire errors violated their right to an error-free trial. But to excuse an appellant's failure to object to an error during trial—when nonsubstantial errors are most easily corrected—something more must be shown than the error itself.

2.      The Claims are Meritless

Appellants' arguments fail on the merits as well. They argue the trial court's discussion about language and religious beliefs discouraged prospective jurors from disclosing any language deficiency or belief that forbade passing judgment on a fellow human being. We disagree. The court's remarks, though strongly worded, were in the main unremarkable and not particularly discouraging. The court in essence informed the jury in no uncertain terms that feigned religious belief or feigned difficulty understanding English would be met with skepticism and tested. But the court also encouraged the prospective jurors to tell the truth, and the record shows two were excused because they had difficulty understanding English.[3]

Further, although a serving peace officer must be excluded from jury duty (Code Civ. Proc., § 219), a reserve officer need be excluded only if he or she had the powers of a peace officer at the time of trial (*People v. Ledesma* (2006) 39 Cal.4th 641, 676). The record here is silent as to whether the prospective juror who indicated he was a reserve police officer had the powers of a peace officer at the time of trial.

Assuming there was some error, it would have been harmless under any standard. (See *Chapman v. California* (1967) 386 U.S. 18, 21 (*Chapman*); *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*).) Appellants identify no juror whose voir dire responses

---

[3] The court stated that "voir dire," meant "speak the truth," adding "that's exactly what we want you to do."

7

suggested the juror was unable to comprehend trial events, and we fail to perceive how an empanelled juror's concealed religious belief forbidding the passing of judgment on another could possibly harm appellants. Appellants argue the court's failure to exclude the reserve police officer for cause forced Toledo's counsel to use a peremptory challenge that otherwise would have been available to remove another prospective juror, but they do not argue they ran out of peremptory challenges or would have excluded another prospective juror if given an opportunity to do so.

## B.    Melina Rodriguez's Police Interviews

Sheriff's Detective Steinwand testified he recorded police interviews with Melina Rodriguez, David Guerrero's girlfriend, in October and November 2006, during which she made several statements incriminating appellants. After Rodriguez recanted her statements at trial, the prosecution played a number of clips from the interviews. In them, she told police that appellants came to her house, on the day of the murder, Toledo received a handgun from Guerrero, and they all ran out of the house.

When asked if they got into a car, Rodriguez responded (in her words), "Yeah they ran oh don't know, I, see, cause we lived on in the back house on San Vicente right there."

When asked whether the incident occurred on a holiday, Rodriguez responded, "I'm not sure." "I wouldn't know, I mean --" "I, I mean it could have been I don't remember what day it was."

When asked what appellants told her after she heard shots fired, Rodriguez responded, "Well I didn't have to hear them talk, obviously I know [Toledo] came in for the gun I heard some shots and bam there's a dead guy. That's obvious and I don't have to asked questions." "They didn't talk to me about it, but obviously I know what happened. Cause you expect me that a guy who spray painted, I know that a guy got killed right there, and I'm telling you what I know ab[o]ut it and I don't have to asked questions to know. Obviously I know [Toledo] ran out and shot two guys."

When asked whether she knew more about the shooting, Rodriguez stated there were "two Black guys," but she didn't know if they were "throwing up signs at the

8

corner." She said, "they were probably spray painting, I don't know." When asked again whether Contreras said anything when he came back after the shooting, Rodriguez answered, "Uh no they just, see cause it happened so fast, when he ran out and did that."

In the second interview, Steinwand asked Rodriguez if Enciso had a blue Tahoe. She answered, "You know what, I'm, I'm thinking he did have a blue Tahoe." Detective Steinwand continued, "At some point around there, did he have one?" Rodriguez responded, "Well, yeah, he did, but he didn't have it for long, so that's why I'm like not remembering."

Appellants' counsel's objections to this evidence were overruled.

Appellants argue the trial court prejudicially erred by admitting some of Rodriguez's statements to the police because "most" were not based on personal knowledge. We disagree.

A witness may testify competently only to matters of which she has personal knowledge. (Evid. Code, § 702.) "Personal knowledge means a present recollection of an impression derived from the exercise of the witness's own senses." (*Alvarez v. State of California* (2000) 79 Cal.App.4th 720, 731.) A trial court's determination of the existence of the preliminary fact of personal knowledge is reviewed for abuse of discretion. (*People v. Lucas* (1995) 12 Cal.4th 415, 466.)

Appellants do not identify which of Rodriguez's statements should have been excluded, but concede she had personal knowledge at least about them entering her house, obtaining a gun from Guerrero, then leaving. As to other questions posed by police, she stated either that she did not know the answer or that the answer suggested by police was "probably" correct, but she did not know. Her only other notable response came when she said, "Obviously I know [Toledo] ran out and shot two guys."

Admission of this statement was harmless error under *Watson*. (See *People v. Kopatz* (2015) 61 Cal.4th 62, 86-87 [*Watson* standard applies to the erroneous admission of hearsay evidence].) Buckhalter identified Toledo and Enciso as participants in White's murder, Rodriguez's recorded interviews confirmed they obtained a gun from Guerrero immediately before the shooting, and ballistics evidence tied them to the

murder through Danny Guerrero, a fellow CV70 member.  No reasonable probability exists that the jury would have reached a different verdict absent Rodriguez's speculation about Toledo.

## C.      Cross-Examination of Detective Steinwand

Detective Steinwand testified about Rodriguez's police interviews, but at trial Rodriguez denied making statements attested to by Steinwand, stating Steinwand's evidence regarding her interviews was false.

On cross-examination, codefendant David Guerrero's counsel asked Steinwand whether he had ever worked with a specialized group within the Sheriff's department devoted to gangs.[4]  Detective Steinwand stated he worked with Operation Safe Streets. The following colloquy then occurred:

"[Defense Counsel]:  And did you become . . . an elite member of a group called the Vikings?

"[Det. Steinwand]:  Are you talking about our mascot for Lynwood Station?

"[Counsel]:  Yes.

"[Det. Steinwand]:  Yes.  I was proud to work in Lynwood Station and serve the community.  And that was just a mascot.  It's not what some of the attorneys think it is. But it was a—it was a great place to work and I'm very proud of that.

"[Counsel]:  What do attorneys think that it is?

"[Det. Steinwand]:  Attorneys think that it's some sinister group.

"[Counsel]:  Sinister type of sinister group?

"[Det. Steinwand]:  Yes.

"[Counsel]:  Why would it—would why attorneys think it's a sinister group?"

After a brief interruption during which the trial court overruled a prosecution objection, Guerrero's defense counsel asked Steinwand whether he had been named in an injunction involving the conduct of the Vikings, but the trial court sustained the prosecution's objection on the ground of lack of foundation.  Counsel then asked

---

[4] Guerrero is not a party to this appeal.

10

Steinwand whether he had been named in a lawsuit as having committed a pervasive pattern of misconduct. Steinwand responded, "I believe there was a lawsuit of some type and I did do a deposition. And as far as I know, my name was removed from the lawsuit at some point." Finally, counsel asked Steinwand whether he had a Vikings tattoo on his leg. The trial court sustained the prosecution's objection on relevance grounds, and said, "Can we just kind of move into the evidence in this case . . . ." Guerrero's counsel then dropped the line of questioning.

Appellants argue a 1990 lawsuit alleged deputies in the Lynwood sub-station of the Los Angeles County Sheriff's Department formed a White-supremacist, neo-Nazi clique called the Vikings that repeatedly violated the civil rights of minorities. Appellants argue the trial court erred in prohibiting Guerrero's counsel from investigating Steinwand's participation in this group to impeach his credibility as a prosecution witness, which violated their Sixth Amendment right to present a defense. The argument is without merit.

A jury may consider the existence of a witness's "bias, interest, or other motive" for testifying untruthfully. (Evid. Code, § 780, subd. (f).) Accordingly, a "party can offer evidence, by proffered extrinsic evidence or by cross-examination of a witness, to attack the credibility of a witness, if such evidence tends reasonably to establish that the witness has a motive to fabricate, or some other motive, that tends to cause the giving of untruthful testimony, even though there may be no reasonable basis for the existence of such a motive." (*People v. Allen* (1978) 77 Cal.App.3d 924, 931.) "Evidence of such a motive may properly include specific acts and conduct of the witness." (*People v. Johnson* (1984) 159 Cal.App.3d 163, 168.) "[W]ide latitude should be given to cross-examination designed to test the credibility of a prosecution witness in a criminal case." (*People v. Cooper* (1991) 53 Cal.3d 771, 816.) But not all questions relating to a witness' credibility need be allowed on cross-examination, nor all evidence offered to show a motive to fabricate. (*People v. Johnson*, at p. 168.) "Evidence of a witness' conduct must *unequivocally* point to a possible motive to fabricate testimony before it is admissible. [Citation.] Moreover, evidence of such a motive need not be admitted where

11

the theory behind the alleged motive to fabricate is highly tenuous, speculative, conjectural or based on 'possibilities.'" (*Ibid*.)  Accordingly, the trial court may impose "reasonable limits on defense counsel's inquiry based on concerns about harassment, confusion of the issues, or relevance." (*People v. Box* (2000) 23 Cal.4th 1153, 1203.)  "A trial court's ruling to admit or exclude evidence offered for impeachment is reviewed for abuse of discretion and will be upheld unless the trial court 'exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.'" (*People v. Ledesma*, *supra*, 39 Cal.4th at p. 705; *People v. Freeman* (1994) 8 Cal.4th 450, 494-495 [applying the same standard to evidence of bias].)  Any error "is subject to harmless error analysis based on factors such as:  'the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case.'" (*People v. Sully* (1991) 53 Cal.3d 1195, 1220.)

Here, the trial court permitted Guerrero's counsel to question Steinwand about the Vikings, its reputation, and Steinwand's participation in the group.  The only question the court disallowed was whether Steinwand had a Vikings tattoo.  Although the court then asked counsel to "just kind of move into the evidence in this case," it did not preclude further questioning as to the Vikings.  Rather, counsel voluntarily discontinued the line of inquiry, having made no offer of proof regarding the Vikings nor suggestion how Steinwand's connection with the group pointed unequivocally to a possible motive for him to give false testimony in this case.

On appeal, appellants' counsel attempt to supplement the trial record with evidence about the Vikings, but it is too late to do so now.  We conclude the trial court acted well within its discretion to limit this tenuous, conjectural, speculative line of questioning.

In any event, any error was harmless.  (*People v. Sully*, *supra*, 53 Cal.3d at p. 1220.)  Again, Buckhalter identified Toledo and Enciso as participants in White's

12

murder, Rodriguez's recorded interviews confirmed their participation, and ballistics evidence tied them to the murder. No reasonable probability exists that evidence of Steinwand's Vikings membership would have impeached his testimony more than Rodriguez's own testimony did or would have had any affect on the other lines of evidence. Lack of error under state law necessarily leads us to reject appellants' constitutional claims predicated on the same grounds. (*People v. Boyer* (2006) 38 Cal.4th 412, 441, fn. 17.)

## D. Hecht's Opinion Testimony

Appellants contend that admission of Detective Hecht's gang expert testimony violated their Sixth Amendment right to confront adverse witnesses because it was based on testimonial hearsay of declarants whom they had no opportunity to cross-examine. The argument is without merit.

Hecht testified he had served as a sworn peace officer for 28 years, worked as a gang detective for seven years, and was a gang suppression deputy for three years. He had formal training on gangs, worked extensively with them, and investigated gang-related murders. He testified gangs demand respect and announce their geographical authority with graffiti. In the gang culture, crossing out a rival gang's graffiti is a sign of disrespect and requires retaliation. A gang member loses respect by failing to retaliate when a gang's authority is challenged and can be killed for cooperating with law enforcement. Hecht opined that the White murder benefitted CV70 by increasing its reputation for violence and intimidating the community, thereby discouraging community members from assisting law enforcement in its investigations of CV70 activities.

Hecht discussed several conflicts between the Leuders Park gang and CV70 over a period of many years, starting with a shooting in Leuders Park in 1998 and progressing down the years of incident after incident of retaliation. Hecht knew CV70 was the main enemy of Leuders Park from his conversations with CV70 members and investigators who were targeting CV70. Leuders Park and CV70 claimed the same area as their territory.

13

As a member of a CV70 task force, Hecht became familiar with appellants, as well as NBP, which was associated with the Leuders Park. Hecht opined that White was a member of the NBP.

Detective Hecht used field identification cards completed by other officers to help form his opinion about Enciso (but not Toledo) and his membership in CV70. He also formed his opinion based on conversations he had with appellants, their tattoos, and a recorded jailhouse conversation involving them. He opined both were CV70 members.

Appellants argue Detective Hecht's testimony about the 1998 Leuders Park shooting and subsequent acts of retaliation comprising the war between CV70 and Leuders Park relied on inadmissible hearsay that was revealed to the jury. We disagree.

On June 30, 2016, our Supreme Court decided *People v. Sanchez* (2016) 63 Cal.4th 665, which held that "case-specific statements" related by a prosecution expert concerning a defendant's gang membership may constitute inadmissible hearsay where the expert presents them as true statements of fact without the requisite independent proof. Such inadmissible statements violate the Confrontation Clause if the hearsay is testimonial, e.g., gathered by police from a witness for the purpose of investigating crime. The decision did "not call into question the propriety of an expert's testimony concerning background information regarding his knowledge and expertise and premises generally accepted in his field." (*Id*. at p. 685.) Improper admission of hearsay constitutes state law statutory error subject to the harmless error test set forth in *Watson*. Improper admission of *testimonial* hearsay implicates constitutional rights and is therefore subject to the *Chapman* test for harmless error. (*People v. Sanchez*, *supra*, at pp. 698-699.)

An example of permissible background information would be an expert's testimony that a particular symbol has been "adopted by a given street gang." (*People v. Sanchez*, *supra*, at p. 677.) An example of impermissible case-specific, testimonial hearsay would be a field identification card filled out by an officer other than the testifying expert. (*Id*. at p. 697.)

Here, Hecht's testimony about the history of CV70 constituted permissible background information. He related only one case-specific hearsay statement about

either appellant—he testified a field identification card indicated Enciso was a CV70 member. It was error to admit this testimony, but the error was harmless beyond a reasonable doubt (the *Chapman* standard) because the same information was obtained from several other sources, including Rodriguez and Hecht's personal conversation with Enciso, who has never denied his gang affiliation.

**E.     Appellants' Restitution and Parole Revocation Fines Must be Reduced**

When appellants were first convicted, the statutory restitution and parole revocation fines were $200. After their convictions were reversed and they were retried and reconvicted, the statutory amount had gone up to $280 for both fines, which the trial court imposed. Appellants argue the increased fines violated their right to be free from double jeopardy. Although arguably they forfeited the claim of error by failing to object to the sentence when it was imposed, we will reach the issue because they also contend they received ineffective assistance of counsel. (*People v. Scott* (1997) 15 Cal.4th 1188, 1201.) Respondent concedes the merits of appellants' argument, and we agree.

A person "may not twice be put in jeopardy." (Cal. Const, art. I, § 15.) When a defendant successfully appeals a conviction and is retried and reconvicted on the same charge, the constitutional prohibition against double jeopardy precludes imposition of a more severe punishment after the second conviction than was imposed after the first. (*People v. Hanson* (2000) 23 Cal.4th 355, 358.) In *People v. Hanson*, the Supreme Court held restitution fines constitute punishment for purposes of double jeopardy, and on remand for resentencing after an appeal, a trial court may not impose restitution fines greater than were imposed in the original judgment. (*Id*. at pp. 366-367.)

Here, appellants were first ordered to pay two fines of $200. After retrial, the trial court ordered them to pay $280 for each fine. This violated appellants' right not to be subjected to a greater punishment after having successfully appealed their first conviction. We will therefore order this component of the sentence reduced to $200.

Enciso further argues he already paid the $200 restitution fine. Nothing in the record supports the argument (other than his trial counsel's representation), but we will order the judgment modified to prohibit reimposition of fines previously paid.

15

**F.     Toledo's Custody Credits**

Toledo argues he should be awarded six additional days of custody credit. Respondent concedes the point, and we agree.

A "sentencing court's computational error resulting in an unauthorized sentence can be corrected at any time." (*People v. Turrin* (2009) 176 Cal.App.4th 1200, 1205.) A defendant convicted of a felony is entitled to credit against a state prison term for actual time spent in custody before commencement of the prison sentence, including the days of arrest and sentencing. (Pen. Code, § 2900.5, subd. (a); *People v. Smith* (1989) 211 Cal.App.3d 523, 525-526.)

Toledo was arrested on January 31, 2006, and sentenced on October 7, 2013, a span of 2,807 days. The trial court awarded him only 2,801 days of actual custody credit. He is thus entitled to an additional six days.

## DISPOSITION

The judgment is modified to impose $200 restitution and parole revocation fines, to reflect that no fine that has been paid may be reimposed, and to award Toledo six additional days of custody credit. In all other respects the judgment is affirmed. The clerk of the superior court is directed to prepare an amended abstract of judgment to reflect the judgment as modified and forward a copy of it to the Department of Corrections and Rehabilitation.

NOT TO BE PUBLISHED.


                                                        CHANEY, Acting P. J.


WE CONCUR:



            JOHNSON, J.



            LUI, J.

16